Argued June 9, affirmed September 13, 1977

TURMAN, *Respondent,*
*v.*
CENTRAL BILLING BUREAU, INC., *Appellant.*
(No. 83660, SC 24764)

568 P2d 1382

[ 443 ]

Mark S. Womble, Portland, argued the cause for appellant. On the brief was Frank J. Susak, Portland.

W. Bradford Jonasson, Jr., Oregon City, argued the cause for respondent. With him on the brief were Santos and Schneider, Oregon City.

Before Denecke, Chief Justice, and Tongue, Bryson, and Tompkins, Justices.

BRYSON, J.

**BRYSON, J.**

Plaintiff brought this action against defendant collection agency to recover damages for defendant's alleged outrageous conduct. Judgment was entered on plaintiff's verdict, and defendant appeals.

Defendant first contends that the trial court erred in denying its motion for a directed verdict. We review the evidence in the light most favorable to the plaintiff to determine if there was sufficient evidence for the case to go to the jury. This court has recognized the tort of outrageous conduct in *Pakos v. Clark,* 253 Or 113, 453 P2d 682 (1969), and *Rockhill v. Pollard,* 259 Or 54, 485 P2d 28 (1971). Neither case is factually similar to this case. However, oppressive behavior of a collection agency that inflicts severe mental distress on a party is generally recognized as such a tort.[1]

Prosser on Torts 57-58, § 12 (4th ed 1971), discusses the problem and states

"* * * that the tort [outrageous conduct] has been used as a potent counter-weapon against the more outrageous high-pressure methods of collection agencies and other creditors. These are sufficiently well known, ranging from violent cursing, abuse, and accusations of dishonesty, through a series of letters * * * which repeatedly threaten arrest, ruination of credit, or a suit which is never brought, or telephone calls around the clock, or attempts to pile up the pressure by involving the plaintiff's employer * * *. It is seldom that any one such item of conduct is found alone in a case; and the liability usually has rested on a prolonged course of hounding by a variety of extreme methods. * * *

"Still another basis on which extreme outrage can be found is the defendant's knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress at the particular conduct. * * *" (Footnotes omitted.)

---

[1]See Prosser, *Insult and Outrage,* 44 Cal L Rev 40, 47-48 (1956); Shenfield, *Debt Collection Practices: Remedies for Abuse,* 10 B C Ind & Com L Rev 698 (1969); Hubbard, *Recovery for Creditor Harassment,* 46 Tex L Rev 950 (1968); Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv L Rev 1033 (1936).

In *Pakos v. Clark, supra* at 123-24, we cited with approval 1 Restatement of Torts (Second) § 46, Comment *e*, which provides in part as follows:

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. * * * In particular police officers, school authorities, landlords, *and collecting creditors* have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous." (Emphasis added.)

In *Rockhill v. Pollard, supra* at 59-60, we discussed Comment *d*, 1 Restatement of Torts (Second) § 46, as it applies to outrageous conduct, and held:

"We think the above summary is of minimal aid in marking the limits of extreme and outrageous conduct which will support an action. It is composed of inconsistent generalities with different connotations for different people. The last sentence is especially suspect. Many members of the community would classify as outrageous conduct which others would describe as rude, callous, or obnoxious. On the other hand, 'utterly intolerable in a civilized community' swings to the other end of the continuum and would seem to exclude much conduct that to us should be classified as actionable."

The evidence in this case shows that plaintiff has suffered from blindness and glaucoma for a number of years and had been treated by the Oregon City Eye Clinic. Plaintiff testified that because of the glaucoma she had continuous treatment. As of March 1, 1971, she had an outstanding account with the Clinic of $46. In May of 1971 plaintiff had not paid her account, and it was assigned to defendant for collection.

Plaintiff's first contact with the defendant was on June 16, 1971. On that date she received an anonymous phone call, informing her that "[t]here will be someone out to your house to serve papers on you from the sheriff's office." She was also warned that unless she paid the bill in full to Central Billing her husband

could lose his job and she could lose her home and everything she owned. The caller concluded the conversation by suggesting that plaintiff contact defendant about the bill and gave plaintiff defendant's phone number.

Shortly thereafter, plaintiff called defendant's office. She was informed that she must pay the bill in full by return mail or there would be someone out from the sheriff's office to serve papers upon her. She was also told that if she did not pay the bill in full her husband could lose his job and that she could lose her home and everything she owned.

Mrs. Turman explained to defendant that she could not pay in full at that time and stated that she would contact the Clinic to arrange a solution to the problem. She further explained that it was necessary that she deal directly with the Clinic as she had a continuing eye disability which required that she maintain a good relationship with the Clinic and the ophthamologist. Defendant insisted that plaintiff not contact the Clinic, but rather pay the bill in full immediately to Central Billing.

After talking with defendant, plaintiff called the Clinic and arranged for payment to be made on a time payment schedule. Plaintiff paid $10 pursuant to this agreement and was informed by the Clinic that defendant would be notified of the agreement. However, eight days after the agreement with the Clinic, plaintiff received another phone call from defendant's agent demanding payment.

Plaintiff explained to defendant's agent that she had arranged with the Clinic to retire the debt. This caused the caller to become very irate and she shouted at plaintiff and threatened her. Despite plaintiff's explanations of why she had to maintain good relations with the Clinic, defendant continued to demand immediate payment and to threaten to take away plaintiff's husband's job and their home. By the end of

the phone conversation, defendant's agent was shouting and plaintiff was in tears.

Plaintiff was so upset by the telephone threats that she called a friend, Julia Smith, and asked her to come over and keep her company. Soon after Mrs. Smith arrived, plaintiff received another phone call from the defendant, which Mrs. Smith overheard. During this phone conversation, defendant's agent again chastised plaintiff for contacting the Clinic.

Mrs. Smith testified and after explaining the defendant's agent's language in detail, she characterized the same as follows:

"A   Well, the swear words, she had quite a vocabulary, or I should say, lack of vocabulary of the right words. But the two words that really stuck in my craw were skum [sic] and dead beat, and I knew they had been trying to pay their bills."

Despite knowledge that plaintiff had already paid ten dollars to the Clinic,[2] defendant's agent continued to demand that plaintiff pay the entire $46 by return mail. During this conversation defendant's agent used profane and abusive language and shouted at plaintiff. When plaintiff attempted to explain to defendant's agent that she was blind and had to maintain a good relationship with the Clinic for that reason, defendant's agent responded that she could "care less about [plaintiff's] being blind" and called her "scum" and a "dead beat."

This is an abbreviated statement of the facts which covered a number of telephone calls over a period of nine days.

■   We conclude that this is not a case where the trial court could say, as a matter of law, that the plaintiff had failed to offer sufficient evidence of extreme and

---

[2]Defendant's agent's insistence that plaintiff not contact or pay the Clinic seems out of place as defendant's sole stockholder and president testified that defendant would receive the money regardless of whether it was paid directly to it or to the Clinic, the assignor.

outrageous conduct. A jury could find that defendant's conduct was outrageous in the extreme. Defendant does not contend that plaintiff did not suffer severe emotional distress and severe headaches. Plaintiff's doctor testified that she was hospitalized on June 25, 1971, because of her state of anxiety, severe stress and physical condition caused by defendant's actions. We conclude the trial court did not err in denying defendant's motion for a directed verdict.[3]

Defendant next contends that "[t]he trial court erred in denying the Defendant's Motion for a new trial on the grounds of misconduct of the jury." Specifically, defendant contends that two of the jurors misrepresented their situation with respect to prior contact with the defendant.

■ We have generally held that a false representation by a juror of his interest, status or situation in a case, or if the juror conceals a material fact relative to the controversy is prejudicial misconduct. *Jones v. Imperial Garages, Inc., et al.,* 174 Or 49, 145 P2d 469 (1944); *State v. Lauth,* 46 Or 342, 80 P 660 (1905); *Walker v. Griffin,* 218 Or 613, 346 P2d 110 (1959). The questions posed by this assignment are: Did the jurors answer falsely and was the defendant prejudiced?

■ In appeals from the denial of a motion for a new trial, such as this, we generally defer to the discretion of the trial court except for an abuse of discretion. *Isom v. River Island Sand & Gravel,* 273 Or 867, 543 P2d 1047 (1975); *Moore v. Adams,* 273 Or 576, 579, 542 P2d 490 (1975).

■■ Juror Bidney was asked whether there was "anything [she] could think of why [she] shouldn't sit." Mrs. Bidney answered, "Well, no, no reason. I will say about four or five years ago we had financial problems and we did have something go through—I believe it might have been your company; I don't know." In fact, the Bidneys' contact with defendant was only three years

---

[3] See Prosser, *Insult and Outrage,* 44 Cal L Rev 40, 45 n. 25.

prior to the trial. However, we do not believe that this minor discrepancy was necessarily intentional so as to warrant a new trial.

Defendant was a licensed collection agency. ORS 697.273 provides, "Every * * * collection agency shall keep a customer file with a current record of all accounts, collections and disbursements." Defendant, knowing that juror Bidney had testified that defendant might have had one of her accounts, waited until after the trial had been concluded and the verdict rendered before coming forth with information in its affidavit. Presumably, this information regarding juror Bidney was in defendant's records and could easily have been ascertained by a telephone call. Nevertheless, defendant did nothing until after it received an adverse verdict. In *Transamerica Title Ins. v. Millar,* 258 Or 258, 262-63, 482 P2d 163 (1971), we stated:

> "* * * After learning of circumstances that would lead a reasonable person to suspect that a situation might exist which was inimical to a fair trial, plaintiff had a choice to make. It could either ask the judge to investigate the circumstances or waive anything that such an investigation would have disclosed. It could not wait and gamble on the outcome of the case and then raise the question if the results were adverse. * * *"

When a party having knowledge of an error or an irregularity during trial fails to call it to the court's attention and remains silent, speculating on the result, he is deemed to have waived the error, and the denial of a motion for a new trial based upon that ground presents no reviewable question. *Wills v. Petros et al,* 225 Or 122, 129, 357 P2d 394 (1960).

On voir dire juror Andrews was asked, "Have you had any personal contact, friends, family, whatever, with collection agencies that might cloud your thinking, sir?" Andrews replied, "No, I have had dealings with collection agencies but it wouldn't cloud my thinking." Juror Andrews further explained that these dealings had been three or four years prior with a

[ 450 ]

collection agency in California. Defendant, as shown by the affidavit of its president, again belatedly, by reference to its files, determined that in 1975 juror Andrews' son had been the object of defendant's collection activities. Defendant also found a letter in its file from a "Mrs. Andrews." There was no evidence as to whether Mrs. Andrews was juror Andrews' mother, wife or daughter-in-law.

We do not believe that a father is necessarily aware of all of his adult son's financial activities. There is no necessary inconsistency between juror Andrews' response on voir dire and the facts revealed by defendant after trial. Furthermore, the precise question asked by defendant was whether Andrews had any contact with collection agencies "which might cloud your thinking." This is a completely subjective question. For all we know, Andrews' response was an honest and correct statement. We conclude the trial court did not err in denying defendant's motion for a new trial.

Defendant also contends "[t]he trial court erred in denying Defendant's Motion for a new trial based on insufficiency of evidence to support the verdict."

The denial of defendant's motion for new trial on this basis is not grounds for an assignment of error. *See Schafer v. Fraser,* 206 Or 446, 489-490, 290 P2d 190, 294 P2d 609 (1955); *Clarizo v. Spada Distributing Co., Inc.,* 231 Or 516, 520-21, 373 P2d 689 (1962); *Paul v. McCudden,* 256 Or 143, 471 P2d 437 (1970); *Baumbach v. Poole,* 266 Or 154, 156-57, 511 P2d 1219 (1973); *Russell v. Rich,* 277 Or 203, 560 P2d 261 (1977).

Affirmed.