Argued and submitted May 4, reversed and remanded December 9, 1981, rehearing
denied January 12, 1984

HALL,
*Petitioner on Review,*
*v.*
The MAY DEPARTMENT STORES
CO. et al,
*Respondents on Review.*

(TC A7708-11282, CA 16335, SC 27501)

637 P2d 126

132

Frank M. Ierulli, Portland, argued the cause and filed briefs for petitioner on review.

Jeffrey M. Batchelor, Portland, argued the cause for respondents on review. With him on the brief were Spears, Lubersky, Campbell & Bledsoe, James H. Clarke and David B. Markowitz.

Before Denecke, Chief Justice, and Tongue, Lent, Linde, Peterson, and Tanzer, Justices.

LINDE, J.

Lent, J., filed an opinion concurring in part and dissenting in part.

Denecke, C. J., filed a dissenting opinion.

## LINDE, J.

Plaintiff, a former saleswoman in the cosmetics department of a Meier & Frank department store, brought an action for damages for defamation and for intentional infliction of emotional distress allegedly suffered after she was questioned by store security personnel about shortages in a cash register. The jury returned verdicts for the defendants on the defamation claim and for compensatory and punitive damages on plaintiff's claim of intentional infliction of emotional distress. The circuit court allowed defendants' motion for judgment notwithstanding the verdict, and the Court of Appeals affirmed without opinion. Having allowed review to consider whether the trial judge applied a mistaken standard or erred in finding the evidence insufficient as a matter of law, we reverse the decision as to the verdict for compensatory damages.

## I. The Facts

The course of events giving rise to this litigation may be briefly summarized as follows. Plaintiff, then 19 years old, was employed in the cosmetics department of Meier & Frank's Washington Square store. She was considered a competent employee with a promising future and was on good terms with her supervisors and other employees. Different lines of merchandise in the department were assigned to the several saleswomen, whose compensation and future assignments depended in part on their success in handling their lines.

The Meier & Frank stores experienced substantial annual losses from theft as well as mistakes. The company attempted to control these losses by means of store security programs, which were conducted by personnel separate from the management of the individual stores. At the time of these events, the programs had for 12 years been directed by defendant George Rummell. In the investigation of cash register shortages, Rummell employed a system of charts which showed the days when a register was short more than $10 and matched these days with the days when individual salespeople were working at a station using the register. A substantial divergence between the charted days of cash register shortages and days at which particular employees worked would tend to eliminate suspicion of

those employees; employees whose days of work showed high correlation with days of shortages would remain potentially responsible for these shortages.

On the basis of one such chart, Rummell on April 1, 1977, sent a woman assistant to bring plaintiff to the security office of the Washington Square store, where he questioned her concerning a run of shortages in the cash register at plaintiff's work station. Plaintiff denied any knowledge of the shortages or their possible cause. At the end of the interrogation, she reported it to her immediate supervisor and subsequently to the manager and assistant manager of the store, who were sympathetic and expressed confidence in her innocence. Plaintiff was given the rest of the day off with pay. She was not thereafter accused of or questioned about the shortages.

Sometime after the events of April 1, plaintiff, through counsel, demanded an apology from defendants. Her career in the cosmetics department gradually took a turn for the worse. Her supervisor assigned to other saleswomen lines of merchandise that plaintiff previously had been assigned or been encouraged to expect, which reduced her sales and income. Eventually, she gave up her employment at Meier & Frank's.

This much is essentially undisputed. There is substantial dispute about Rummell's manner of questioning plaintiff, to which we return after reviewing the relevant legal issues.

## II. The Tort

Plaintiff's claim rests on a tort theory which Professor William Prosser synthesized from scattered cases allowing recovery for mental distress in a variety of factual settings. Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich L Rev 874 (1939); *see* White, *Tort Law in America* 102-106 (1980). In such an effort to describe divergent factual patterns as instances of a single tort, it is not easy to define the elements of the tort so as to fit all cases. As appears from the title given it in Prosser's article, however, and later embraced in the Restatement of Torts § 46, "Conduct Intended to Cause Emotional Distress Only," (1948 Supp 612-616), the theory of plaintiff's claim

belongs among the intentional torts. Like most torts, it is marked by the elements of a defendant's state of mind, the character of the defendant's act that causes the plaintiff's injury, the nature of plaintiff's injury, and under some circumstances the relationship between plaintiff and defendant. *See Brewer v. Erwin,* 287 Or 435, 454-458, 600 P2d 398 (1979).

■       In the cases, the element of defendant's "intent" ranges from a calculated purpose to inflict mental or emotional distress because of personal hostility, or for some impersonal purpose like the debt collection methods in *Turman v. Central Billing Bureau, Inc.,* 279 Or 443, 568 P2d 1382 (1977), through the mindless "amusement" of practical jokes, as in the leading case of *Wilkinson v. Downton,* [1897] 2 Q.B. 57, to encompass also the intent to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself, as this court found in the case of a physician who turned away accident victims seeking his help. *Rockhill v. Pollard,* 259 Or 54, 485 P2d 28 (1971). Lack of foresight, indifference to possible distress, even gross negligence is not enough to support this theory of recovery.

■       Apart from intent, defendant's act must in fact cause plaintiff mental or emotional distress of a severe and serious kind; the tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability. Similarly, insults, harsh or intimidating words, or rude behavior ordinarily do not result in liability for damages even when intended to cause distress. Contemporary standards of civility hardly allow turning every case of justified indignation into an action for financial recompense. *See Brewer v. Erwin, supra,* 287 Or at 457, 600 P2d 398 (1979), *Pakos v. Clark,* 253 Or 113, 132, 453 P2d 682 (1969). The tort requires some extraordinary transgression of the bounds of socially tolerable conduct.

In attempting to articulate what separates actionable conduct from the ordinary run of crudely aggressive,

overbearing, or ill-tempered behavior, Prosser and the Restatement turned to adjectives like "outrageous" and "extreme." These are not words of art; other words or phrases could serve as well. All are designed only to express the outer end of some gradation or scale of impropriety and social disapproval. No more can be conveyed by defining one epithet by another. As the court said in *Rockhill v. Pollard, supra,* 259 Or at 60, for the purpose of informing a trial court's exercise of its own responsibility, as in this case, the facts of the decided cases probably convey more than any battery of verbal formulas.

As already stated, *Rockhill* sustained a recovery when a physician, called to his office on a December evening to meet injured accident victims including an unconscious infant, rudely refused to administer proper medical examinations or emergency treatment. The conclusion rested substantially on the physician's professional obligations toward patients.[1] A preceding decision, the first in this state to discuss the Restatement formulation, sustained a nonsuit against a plaintiff who claimed that deputy sheriffs upset and frustrated him when he went to the sheriff's office to inquire about a charge made against him. The court held that even if the officers' conduct was annoying or insulting, "an indignity to plaintiff and conduct unbecoming peace officers," a jury could not reasonably find it "so extreme and outrageous as to permit recovery." *Pakos v. Clark,* 253 Or 113, 132, 453 P2d 682 (1969). A third decision, *Turman v. Central Billing Bureau, Inc., supra,* affirmed the liability of a debt collection agency which pursued plaintiff with abusive and threatening telephone calls even after learning that plaintiff had made arrangements with the creditor to settle the debt. Most recently, in *Brewer v. Erwin, supra,* we described *Turman* as falling within "a well recognized line of cases involving personally abusive business tactics. . . against inexperienced and vulnerable individuals." 287 Or at 457. In *Brewer*

---

[1] "An important factor in this case is the particular relationship between the parties. Defendant had come to his office for the express purpose of rendering professional aid to the victims of an automobile accident. He met a distraught mother with an unconscious baby who was totally dependent on him to diagnose the baby's condition and do something about it. Defendant was under a professional obligation to plaintiff—they were not dealing at arm's length." 259 Or at 60.

itself, a landlord began to demolish a building from which he had attempted to evict the plaintiff, after previous encounters in which defendants threatened and used physical force against plaintiff or her friends, and the court held it a jury question whether this was done deliberately to intimidate plaintiff into giving up her apartment, and if so, whether defendants' choice of means "went beyond the outer limits of what a reasonable person in plaintiff's position should be expected to tolerate in an arm's-length dispute." 287 Or at 458.

These cases show that there are at least three distinguishable issues facing a trial court in a case like the present. The first is whether the relationship between a defendant and the victim of the alleged tort is one that imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers. The character of the relationship bears on the mental element required to impose liability, *compare Rockhill* with *Turman* and *Brewer,* and also on the next issue, the offensiveness of conduct that crosses the threshold of potential liability, *see Pakos v. Clark, supra.*

The second issue facing a trial court is whether the acts alleged against the defendant, if proved, qualify as extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior, in whatever condemnatory terms this may be characterized. The third issue, of course, is whether there is evidence from which a reasonable jury may find that a disputed relationship in fact existed and that the defendant in fact engaged in conduct meeting the second test.

To put the same point another way, the law, much as in negligence cases, calls on the factfinder, jury or judge, to decide two kinds of questions. One kind concerns what the defendant did, with what intent, and to what extent his acts caused the plaintiff severe emotional distress. These are questions of historical facts. Assuming that each factual element is shown, the other decision is whether the offensiveness of the defendant's conduct exceeds any reasonable limit of social toleration. This is a judgment of social standards rather than of specific occurrences. It is

the kind of judgment for which the law does not demand the same evidentiary basis that is required for reconstructing disputed events. Despite this distinction, however, each issue is subject to judicial decision in the familiar manner when reasonable factfinders could reach only one conclusion on the evidence. As the court stated in *Pakos v. Clark, supra:*

> "It was for the trial court to determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If the minds of reasonable men would not differ on the subject the court was obliged to grant an order of involuntary nonsuit, which in this case was done."

253 Or at 132.

### III. Application to this case.

■ In applying these rules to the present case, the parties take the following positions. On the first issue, plaintiff contends that the relationship between employer and employee imposes more demanding obligations to refrain from inflicting mental or emotional affronts than apply between strangers. There is support for this view. When a foreman allegedly shouted abusive racial epithets in the course of discharging an employee, who subsequently was reinstated by an arbitrator, the California Supreme Court stated that "plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants." *Alcorn v. Anbro Engineering, Inc.,* 2 Cal 3d 493, 498, n. 2, 468 P2d 216, 86 Cal Rptr 88 (1970). The same view of an employer's potential responsibility to protect an employee from racial insults was taken by the Supreme Court of Washington in *Contreras v. Crown Zellerbach Corp.,* 88 Wash 2d 735, 565 P2d 1173 (1977), in which an employee alleged that management personnel accused him of theft and also failed to control racial slurs and ridicule by other employees. The relevance of the employment relationship, of course, is not confined to that form of abuse. In our view, the duty to refrain from abusive behavior in the employment relationship comes closer to that of the physician toward a patient in *Rockhill v. Pollard, supra,* than to that of the police officers toward a citizen not in custody and free to terminate the encounter, in *Pakos v. Clark, supra.*

Defendants contend that regardless whether liability in the employment relationship requires an actual purpose to inflict severe mental distress or only reckless disregard of the distress inflicted, plaintiff neither pleaded nor proved conduct that a jury could find to transgress the limits which the law sets in this tort. Their further contentions are that plaintiff did not show emotional distress of the required magnitude and that defendants' conduct was privileged or justified in the context of investigating the cash register losses; also, by cross-assignments of error, that the trial court did not properly instruct the jury on the character of misconduct required for liability and that punitive damages for insulting or offensive words are impermissible under *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979).

The crux of plaintiff's claim is that defendant Rummell, as director of security of Meier & Frank Co., accused plaintiff of stealing money and threatened her with prosecution and imprisonment in a manner designed to frighten her and make her an example for other employees, that Rummell made the accusation regardless of his actual belief as to her guilt or innocence and that subsequently she was put under surveillance and was denied the opportunity to sell merchandise successfully so that eventually she had to quit her job. We focus particularly on whether the jury could find that Rummell attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part. Two other charges made by plaintiff have no independent force to establish this tort. Asserted weaknesses of the charting system would not be in point divorced from its intentional use as a psychological instrument in confrontations with suspected employees. Also, the decisions concerning plaintiff's work assignments subsequent to the episode were not the kind of acts encompassed by this tort. Such acts may give rise to a remedy under an individual or collective employment contract, but under the most favorable view of plaintiff's evidence these managerial decisions did not qualify as intentional infliction of severe mental distress by the kind of aggravated acts of persecution that a jury could find beyond all tolerable bounds of civilized behavior.

With respect to the alleged abusive questioning, only plaintiff, Rummell, and Rummell's assistant were present at the interrogation, and most of plaintiff's evidence consists of her own testimony. The following summarizes those parts of her testimony most supportive of her claim. Plaintiff was summoned to the store security office. Mr. Rummell introduced himself as a store security officer. Plaintiff felt that she was not free to leave. Rummell stood behind a desk on which there were "large pieces of paper" on which she could see her name and "a lot of figures." Rummell told plaintiff that there were shortages in her register, that he knew she was stealing substantial amounts of money from the register, that he wanted to help her but could only help her if she told the truth. He said that she seemed not to realize how serious a crime this is; "we are talking about embezzlement, which is punishable by years in jail." Plaintiff testified that when she asked if Rummell thought she was stealing money, "he yelled at that point in a loud voice. He said 'No, we know you have been stealing money.'" He said that he "had proof right here" that she was stealing, slapping his hand down on his desk with the papers containing her name and the figures, but without explaining what the papers were. "He told me he was going to have a warrant for my arrest next week if I didn't tell the truth."

Much of this testimony was denied or contradicted by the other two persons present, but of course the jury could believe plaintiff's version. Also relevant to the element of Rummell's frame of mind is his own testimony that when he accused plaintiff he regarded her guilt as only one possibility: "Either she was stealing the money or she was making mistakes or someone was setting her up to make her look like the guilty person." He was uncertain that he had explained the charts to plaintiff. He had used the method of questioning employees on the basis of charts many times and succeeded in getting confessions. When plaintiff insisted that she did not take the money, he "believed her." When asked, "then what good is your chart?" he responded: "At that point, none."

Accepting all evidence and drawing all reasonable inferences most favorable to the jury's verdict, as the trial

court was bound to do on motion for judgment notwithstanding the verdict, the jury could find that Rummell knew that he did not have "proof" of plaintiff's guilt, that he knew he did not have evidence sufficient to have her arrested, that he nevertheless told her that he had sufficient proof to have her arrested and charged with embezzlement, and that he shouted at plaintiff and pounded the desk, referring to sheets of paper which he did not explain to her. Moreover, the jury could infer that although Rummell knew that the charts at most were evidence for one of several hypotheses, his insistence that he had "proof," coupled with offering the employee a choice between accepting his "help" and a threat of arrest and prosecution, were a deliberate and systematic tactic to threaten and frighten the employee into a confession.

This possible inference takes plaintiff's case over the threshold into the range within which a jury could decide that defendants' method of interrogation was an extraordinary transgression of contemporary standards of civilized conduct toward an employee. We do not suggest that questioning an employee about suspected wrongdoing, even accusations and raised voices, suffice for this tort;[2] in many respects employment remains an arm's-length, adult relationship between parties intent on securing divergent rather than joint interests. But an additional element appears when an employee is subjected to severe mental and emotional distress, not as an incidental effect of an unpleasant confrontation, but intentionally as a cold-

---

[2] The trial court explained in ruling on defendants' motion for a directed verdict:

"As to the outrageous conduct, the conduct here is just, even if we simply accept the testimony of the Plaintiff, there is not really a great deal. The Plaintiff testified to a raised voice and the slamming of a hand on a desk and the indication of the possibility of a warrant for an arrest or jail sentence, and that, as I recall, is really the only significant difference in the testimony as to the incident.

"Even accepting that as true, and ignoring the Defendants' evidence, I don't believe this kind of conduct can be found to be the kind of outrageous in the extreme that would support an award of damages, but I'm not confident enough because of the turmoil the law is in to want to risk having to have the case tried over again.

"I'm going to submit it to the jury and then we'll have a complete record, but I will say this: If there is a verdict for the Plaintiff on the outrageous conduct I will grant a judgment notwithstanding the verdict. . . ."

blooded tactic of interrogation upon scanty evidence.[3] This inference, if believed, takes the case closer to the debt collection tactics involved in *Turman v. Central Billing Bureau, Inc., supra,* with the further element here of the relative dependency of the employee in the employment relationship. Of course, we do not say that defendants' conduct of the interrogation in this case was tortious as a matter of law. We hold only that if a jury, drawing all possible inferences favorable to plaintiff, found an intentionally oppressive method of browbeating an employee into a confession, it could also decide that this method went beyond the outer bounds of socially tolerable employer practices.

### IV. Defendants' cross-assignments: Instructions.

Defendants presented certain cross-assignments of error which the Court of Appeals, in affirming the trial court's decision for defendants, did not need to reach. Because we reverse the decision that there was insufficient evidence to support a jury verdict, we must reach them here.

■■ Defendants' first two cross-assignments concern the denial of certain requested jury instructions. The trial court defined the tort for the jury in the following terms:

"One who, through conduct which is outrageous in the extreme, intentionally or recklessly causes severe emotional distress to another, is subject to liability for such emotional distress.

"Plaintiff can recover here if Plaintiff establishes the following:

"First, extreme and outrageous conduct by the Defendants;

"Second, the Defendants engaged in such conduct intentionally or recklessly;

"Third, that Plaintiff suffered severe emotional distress as a result of such conduct."

One of defendants' requested instructions would have stated:

---

[3] Deliberate infliction of distress as a tactic also carries defendants' conduct beyond the privilege of insisting on the employer's legal rights "in a permissible way" even with knowledge "that such insistence is certain to cause emotional distress," as defendants quote from Restatement (Second) Torts § 46, comment *g.*

"Liability for the tort of outrageous conduct exists only where the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."

The trial court did not err in declining to give this instruction. It should be recalled that neither the appellate courts nor draftsmen of proposed uniform jury instructions prescribe in the first instance the exact form in which a trial judge must explain the law to a jury. Defendants argue that more than the definition given by the trial court in this case should be provided, pointing out that the jury requested additional explanation of the term "outrageous behavior in the extreme." This may well be true. As we have said, adjectives of degree such as "outrageous" and "extreme" may be helpful, but they are not words of art; if used as isolated terms of condemnation they may substitute mere indignation for the required attention to the intent and the actual effect of inflicting severe distress by socially intolerable means.[4] A court might well go further to explain the nature of the social judgment required of jurors under such rubrics as "outrageous" or "extreme" in the context of the type of case before them, if it uses these epithets at all. But defendants' instruction would not contribute to such an explanation. It proposed to heighten the required level of indignation by adding to "outrageous" and "extreme" such additional modifiers as "atrocious" and "utterly." This would revert to the contest of epithets which the court found to be "of minimal aid" in *Rockhill v. Pollard, supra,* 259 Or at 60.

■ ■ Two other instructions requested by defendants sought to express a distinction between "extreme out-rageous conduct" and mere annoyances or affronts, for which defendant would not be liable.[5] Ordinarily, if a jury is

---

[4] It also deserves attention whether both "intent" and "recklessness" fit defendant's potential liability in the particular relationship at issue; in this case, for instance, it is the possible inference of deliberate infliction of distress as a tactic that brings the facts within the range of jury condemnation. Defendants did not object to the inclusion of "recklessly" in the court's instructions.

[5] The requested instructions were:

" 'Conduct which is merely annoying, insulting, indignant, or unbecoming of an employer is insufficient to constitute extreme outrageous conduct.

" 'Plaintiff cannot recover for annoyances and affronts to her dignity.' "

correctly instructed on those elements that it must find in order to reach an affirmative conclusion, a court need not go further and submit the opposing side's version of various circumstances that would *not* suffice to reach the disputed conclusion. Perhaps a trial court would find it helpful to do so in explaining a tort like the present, which calls for a judgment of degree that courts and commentators have not found easy to articulate. Given the previously mentioned fact that the tort was synthesized to describe very different kinds of actionable conduct in a variety of different settings, it may be unwise to search for a single verbal formula to cover every case in which plaintiff seeks recovery for intentional infliction of emotional distress. It therefore may not be improper to include in the explanation of the tort some phrases indicating the limits of its reach as suggested by defendants. But we cannot say that the negative instructions proposed by defendant were either so correct[6] or so essential that failure to give them was reversible error.

## V. Punitive damages

■   ■ Defendants also assign as error the trial court's denial of their motion to remove plaintiff's claim for punitive damages from the jury's consideration, for two reasons. They contend that this is not a case for punitive damages, first, because defendants' conduct, even if found tortious, was not sufficiently aggravated, and second, because the asserted tort consisted of the verbal communication of accusations, questions, and threats of legal actions, which could only support compensation but not punishment under this court's decision in *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979).

None of the earlier cases reached this court at a stage involving the adequacy of evidence to support punitive damages. But it seems clear that in a jurisdiction which generally allows punitive damages for grave intentional torts, punitive damages in principle are allowable when an "extraordinary" or "extreme" transgression of

---

[6] In the first proposed instruction, *supra* n. 6, the word "indignant" is out of place as a description of "conduct." The second instruction, standing alone, would be overly broad and inexact in excluding all "annoyances" and "affronts" even when inflicted with the intent and with the result of causing severe distress.

social norms is an indispensable element of the tort itself. When the jury is correctly instructed on that element of liability as well as on compensatory and punitive damages, and there is evidence to support its verdict as to liability, this tort leaves little room to scrutinize the facts for an additional degree of aggravation to support punitive damages.

■■■ Application of defendants' second point to this case is more complex. *Wheeler v. Green, supra,* was a defamation case in which a jury had allowed punitive damages. On appeal, this court unanimously held that the Oregon Constitution, which guarantees a remedy for actual injury from defamation, also denies punitive damages for even defamatory expression. The holding rested on a careful accommodation of two sections of the Bill of Rights. Article I, section 8, guarantees "the free expression of opinion" and "the right to speak, write, or print freely on any subject whatever," subject to responsibility "for the abuse of this right."[7] Article I, section 10 guarantees every person "a remedy in due course of law for injury done him in his person, property or reputation."[8] *Wheeler v. Green* found the proper accommodation in interpreting the responsibility for abuse which section 8 excludes from freedom of speech to be responsibility to an injured party for the "injury done him in his person, property, or reputation" stated in section 10. It does not extend beyond compensation for the injury to punishment or deterrence. The court wrote:

"Defamatory statements, of course, have throughout the history of this state been recognized as an abuse of the right of free expression for which a person is to be held responsible under the provisions of Article I, § 8. However, when we consider the ways in which a person may be held responsible in a civil action for defamatory speech or

---

[7] Or Const, art I, § 8:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[8] Or Const, art I, § 10:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

writing, we must also consider the provisions of Article I, § 10, which guarantees every person a remedy by 'due course of law for injury done him in his * * * reputation.' Construing together these two provisions of Article I, both of which have a direct bearing on defamation cases, we hold that in a common-law civil action for damages, the defendant who has abused the right of free expression by defamatory statements may be held responsible only to the extent of permitting the injured party to recover for the resulting injury to reputation—that is, to recover compensatory damages.

"[Punitive damages are for punishment and deterrence] Neither punishment nor deterrence of others is necessary to compensate the plaintiff for injury to reputation."

286 Or at 118. The principle of the holding, as stated above, was that punitive damages by definition go beyond whatever financial recompense is proper to compensate a plaintiff for the injury suffered by the plaintiff personally. Where such damages beyond any actual injury are allowable, the plaintiff collects them as a form of public punishment, not by virtue of a personal entitlement to compensation. When the cause of defendant's liability is his "abuse" of speech and expression, as in the case of defamation, *Wheeler v. Green* holds that the "responsibility for the abuse" is confined to civil liability for compensation only. Here the injury was to plaintiff's person rather than her reputation, but as long as it resulted from an "abuse" of speech only, the principle is the same.

Clearly Mr. Rummell's words and expressions, if the jury believed plaintiff's testimony, were an "abuse," not unlike the accusations defendants made against plaintiff in *Wheeler v. Green.* [9] Plaintiff seeks to distinguish the rule

---

[9] Defendants in *Wheeler v. Green* accused plaintiff, a horse trainer, of forging their checks and bribing race personnel.

Obviously we do not hold that Mr. Rummell's words and expressions here were privileged "free speech" under art I, section 8, any more than the defamatory words and expressions in *Wheeler v. Green.* That would foreclose a legal remedy altogether. We only hold that they were, however, speech and expression within the meaning of that section, so that he and his employer were "responsible for the abuse" only to the extent of allowing a "remedy for injury done" to plaintiff under art I, section 10. It may be that many uses of words, for instance in the commission of conventional common law crimes, were historically excluded from the reference in § 8 to speaking or expressing an opinion, but we are not prepared to say that this is true of the expression of accusations or other offensive words. As

of *Wheeler v. Green* because "speech is the gravamen of the tort of defamation," whereas, according to plaintiff's argument, Mr. Rummell's speech in this case was only incidental to the tort of intentional infliction of severe emotional distress. The distinction would have weight if the tort in this case rested on any conduct other than Rummell's accusations to plaintiff in the course of his interrogation. Of course infliction of emotional distress, unlike defamation, can be committed by other means than expression or communication. *See, e.g., Brewer v. Erwin, supra.* But in this case we have found no other conduct that could qualify as this tort.

As stated above, our affirmance of the jury's verdict rests solely on the possible inference by the jury that Rummell threatened plaintiff with arrest and prosecution by referring to "proof" of her guilt which he himself thought less than compelling, and that he did so for the deliberate purpose of upsetting her into a confession. But his accusations were speech and expression of opinion, even though a jury could find that they were tortious in manner and purpose and thus gave rise to a civil remedy for injury done by the "abuse." To put the point in a nutshell: If Rummell had called plaintiff a thief in the presence of the third person at the interrogation, the rule of *Wheeler v. Green* would limit her recovery for slander to actual damages and exclude punitive damages. If he had broadcast his accusation throughout the store or published it in print, her actual damages might be greater, but punitive damages would be excluded. The same distinction between "remedy" and "punishment" for speech and expression of opinion excludes punitive damages when the accusation was made to her face and the injury for which she seeks a remedy is emotional distress.

Accordingly, the decision of the Court of Appeals is reversed and the case is remanded to the circuit court for entry of a judgment on the jury verdict without punitive damages.

---

to the "horrible example" invented by the dissent, it is very doubtful that the state could constitutionally subject the hypothetical speech to criminal punishment, to which punitive damages are an analogue.

Reversed and remanded.

**LENT, J.,** concurring in part; dissenting in part.

I concur in the majority opinion with respect to holding that defendants were not entitled to judgment notwithstanding plaintiff's verdict and that plaintiff's judgment for compensatory damages must be reinstated. I dissent from that part of the majority opinion concerning defendants' conduct following the "browbeating" incident and the majority's decision concerning punitive damages.

The majority has found that the evidence of the browbeating and its circumstances was such as to present a case for the jury upon plaintiff's theory of recovery in tort. With that I agree. The majority goes on, however, 292 Or at 139, 637 P2d at 132, to set the stage for its treatment of punitive damage by stating that

"the decisions concerning plaintiff's work assignments subsequent to the episode were not the kind of acts encompassed by this tort."

By this ploy the majority seeks to establish that defendants' tortious conduct consisted of nothing but speech so as to support its holding that the Oregon Constitution does not permit recovery of punitive damages. Thus is formed the basis for the later assertion by the majority:

"Plaintiff seeks to distinguish the rule of *Wheeler v. Green* because 'speech is the gravamen of the tort of defamation,' whereas, according to plaintiff's argument, Mr. Rummell's speech in this case was only incidental to the tort of intentional infliction of severe emotional distress. *The distinction would have weight if the tort in this case rested on any conduct other than Rummell's accusations to plaintiff in the course of his interrogation.*" (Emphasis added.)

292 Or at 146-47, 637 P2d at 136.

Plaintiff's complaint is not that the defendants made *decisions* concerning her work assignments after the browbeating episode. Rather, she complains of defendants' *conduct* following the episode as being part of the ongoing tortious conduct[1] shown by the evidence. It is a reasonable

---

[1] This court has held that the tort with which we are here concerned may consist of a course of conduct intended to cause the plaintiff severe emotional distress. *Turman v. Central Billing Bureau, Inc.*, 279 Or 443, 568 P2d 1382 (1977).

inference that the conduct was the result of decisions, but her complaint concerns the conduct, not the decisions which led to the conduct.

There is evidence from which the jury could have found the following: Plaintiff was an employee at will and therefore vulnerable as being subject to discharge at her employer's whim. She had won certificates of excellence in training courses offered at her employer's expense. The purpose of the training courses was to fit plaintiff for selling certain lines of cosmetics if and when they became available. Her employer had indicated that at such time she would be the one to handle those lines. Plaintiff had been given a rating of "higher than average" by her supervisor, DuBrauer, and other laudatory comments had been made about plaintiff's work. A vice-president of the employer had, at a special luncheon to honor plaintiff and one other employee, presented plaintiff with an award for excellent service in her job. She had enjoyed a good working and social relationship with her co-workers and with DuBrauer.

The evidence would support findings that after the encounter with Rummell, plaintiff failed to get a new line of cosmetics for which she had been trained, and her employer gave her a false reason for that action. Later, another line was taken from her and she was given a reason which was patently false to her. A showcase she used to display her shampoo line was taken from her, resulting in her not being able to display her goods properly. Her sales dropped drastically. Her employer's security people conducted almost constant surveillance of her. Her co-workers and DuBrauer ostracized her. She became so distressed by all of this that she could not continue the employment.

It is about the entire course of conduct that the plaintiff has complained, not just in the evidence but in detail in her second amended complaint. It is entirely beyond me as to how the majority can brazenly state that plaintiff's case rested on nothing more than Rummell's accusations. There was an abundance of other conduct, perhaps more subtle than Rummell's shouting and table pounding, but nevertheless a continuation of the harassment which commenced with that incident. Eventually the

purpose of that conduct succeeded as plaintiff became so distressed as to cause her to leave an employment which had formerly promised so much to her.

In the majority's own words, that conduct affords the basis to distinguish our decision in *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979).

At 292 Or at 147, 637 P2d at 136, the majority puts its point in a "nutshell" by use of an example. The example no more convinces me than does the holding of the case at bar. I would suggest another example: A man seduces a previously chaste adult woman. She is afterwards filled with remorse and rejects his importunities to engage in further sexual relations. He is angered by this, and upon a Sunday morning he enters the church she and her family have long attended and, in the presence of her family and lifelong friends and company assembled, shouts out to her the details of the sexual encounter. He intends to get even with her for rejecting him by causing her severe emotional distress. His statements are all strictly true and would not therefore support an action for damages for defamation. She immediately becomes hysterical and eventually develops agoraphobia as a result of defendant's speech in the church. I find nothing in the Oregon Constitution or in *Wheeler v. Green, supra,* [2] which would support a holding that because the defendant's conduct consisted of nothing but speech, he would be immune from an award of punitive damages should the trier of fact desire to make such an award.

The decision in that case to take away plaintiff's award of punitive damages was an accommodation of a

---

[2] Sometimes one is a party to a decision which, with the passage of time, does not seem so logical or the result so compelling as one once believed. It happens on even the highest court of this land.

"Although I joined the Court's opinion in *New York Times [v. Sullivan],* I have come greatly to regret the use in that opinion of the phrase 'actual malice.'"

*Herbert v. Lando,* 441 US 153, 99 S Ct 1635, 60 L Ed 2d 115 (1979), Stewart, J., dissenting, 60 L Ed 2d at 148.

I find that as time goes on I have acquired some reservations about our decision (which I authored) in *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979), but this case does not present the necessity of formally re-examining my position there taken.

perceived conflict between the grant of freedom of speech, Article I, section 8, of the Oregon Constitution, and the preservation of remedy for injury to reputation, Article I, section 10, of the Oregon Constitution. That conflict is not presented here, and the case is not in point.

I dissent.

Tongue, J., joins in this opinion.

**DENECKE, C. J.,** dissenting.

I concur with the majority's analysis of the tort of intentional infliction of emotional distress and the decision that punitive damages are not awardable. However, I dissent from the majority decision that whether the defendant committed the tort of intentional infliction of emotional distress was a question for the jury. I would affirm the decision of the trial court and the Court of Appeals that it was not, as a matter of law.

The cause of action frequently referred to as "outrageous conduct" is a most amorphous tort. The issue on which I disagree with the majority is stated by the majority to be "whether the acts alleged against the defendant, if proved, qualify as extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior." This is obviously a very ethereal standard.

The indefiniteness of the tort is illustrated by the instruction of the trial court: "Plaintiff can recover here if Plaintiff establishes the following: First, extreme and outrageous conduct by the Defendants." I have no suggestions for a more precise instruction, but it is apparent that an instruction such as this practically submits the case without guidelines. Under these circumstances, I am of the opinion that in case of doubt whether the question is one for the jury, the court should rule that it should not be submitted to the jury.

There is another reason why this case does not present a jury question. The objective of the defendant was not only completely lawful, it was commendable. We are told by the media that "white collar" crime, particularly employe theft, is a national problem which costs consumers

billions of dollars because the cost is passed on to the consumers. However, employers who exceed the legitimate bounds of criminal detection are liable to pay damages pursuant to reasonably well defined existing remedies such as false imprisonment, malicious prosecution and defamation. *Cribbs v. Montgomery Ward & Co.*, 202 Or 8, 272 P2d 978 (1954); *Kraft v. Montgomery Ward & Co., Inc.*, 220 Or 230, 315 P2d 559, 348 P2d 239, 92 ALR2d 1 (1960). (The plaintiff in this case alleged a count of defamation; however, the jury found against her on that count.) I know of no policy reason to expand an employe's remedies in a case such as this.

The majority relies upon the following evidence to support its premise that the question should go to the jury. Rummell accused plaintiff of stealing, told her he would get a warrant for her arrest for a crime for which she could serve years in jail, "yelled at her," and said he had "proof" she had stolen. The facts were that he had charts which indicated shortages at the register when plaintiff was working and responsible for the register; however, the charts were not conclusive proof that plaintiff committed any crime. In the past, employes confronted with similar charts had usually confessed. In addition, according to plaintiff, Rummell asked plaintiff whether she "thought somebody might be setting you up?" Plaintiff did not believe so.

Our past decisions, cited in the majority opinion, do not require a holding that this evidence presents a jury question. Perhaps the closest on point is *Turman v. Central Billing Bureau*, 279 Or 443, 568 P2d 1382 (1977). Closest, because, as in the present case, the defendant initially was pursuing a legitimate objective, bill collecting. In that case, however, after plaintiff had made satisfactory arrangements to pay the bill and the defendant no longer had a legitimate objective, the defendant continued its abrasive tactics.

As the majority states, Professor Prosser was the "synthesizer" of this tort and the reporter for the Restatement of Torts (Second). The comment to section 46 of the Restatement, the section concerning "Outrageous Conduct," states, in part:

"* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. * * *." 1 Restatement (Second) Torts & 46, p 73.

In my opinion this case does not present a jury question. If the plaintiff had in fact embezzled funds from the register and confessed, according to the logic of the majority it nevertheless would be a jury question whether the defendant had committed the tort.