Argued and submitted December 23, 1988, affirmed October 11, 1989

## KELLEY,
*Appellant,*

*v.*

## SISTERS OF PROVIDENCE IN OREGON et al,
*Respondents.*

(86-1165-J-3; CA A45667)

781 P2d 354

Claudette L. Yost, Medford, argued the cause and filed the briefs for appellant.

Robert L. Cowling, Medford, argued the cause for respondents. With him on the brief were P. David Ingalls, and Cowling & Heysell, Medford.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

## DEITS, J.

Plaintiff brought this action for employment discrimination, ORS 659.030, wrongful discharge and intentional infliction of mental distress.[1] The trial court granted defendants' motion for directed verdict on the mental distress claim and held for defendants on the employment discrimination claim. The jury returned a verdict for defendants on the wrongful discharge claim. Plaintiff appeals, and we affirm.

Plaintiff was employed at a hospital operated by defendant Sisters of Providence in Oregon from January 16, 1978, to November 12, 1985. Since 1981, she had worked as a technician in the special procedures department. In 1984, she took a three-month maternity leave, returning to work on a part-time basis. At her request, she worked half days, five days a week, and was also on call, for which she was paid overtime. Because of considerable on-call work, she often worked close to 40 hours a week. Plaintiff became pregnant again in 1985. Her physician restricted her to "light duty" work after August 1, 1985, which precluded her from doing her job at the hospital. He also directed her to take six weeks postpartum leave. She requested, and was given authorization for, a leave of absence from August 1, 1985,[2] until October 1, 1985.[3]

Plaintiff had historically performed her job without incident. However, she had experienced difficulties in her relationship with her supervisor, defendant Eppel. Apparently, Eppel expressed some concerns about small children interfering with a parent's ability to perform a job and thought that it was unfair that women were allowed to use sick leave for pregnancies. Just before she went on leave, plaintiff mentioned to a supervisor in the radiology department, defendant Owsley, that she did not like working for Eppel and that, if

---

[1] Plaintiff identifies this cause of action as "outrageous conduct." However, it is "intentional infliction of mental distress." *See Patton v. J. C. Penney Co.,* 301 Or 117, 119 n 1, 719 P2d 854 (1986).

[2] The form granting the leave indicated that she might have to leave earlier than August 1.

[3] Initially, there was some confusion as to whether she was on sick leave or on a leave of absence. At first, plaintiff apparently had not been expecting to be paid for sick leave, but once she had received her first check she decided that she would use all of her sick leave before using her leave of absence. She was paid for sick leave from July 15 to August 17 and then was on leave of absence.

Owsley had an opening in his department, she would like to return to work there after her leave. Owsley told Eppel of that conversation.

While plaintiff was on sick leave, she worked in a doctor's office. Her co-workers found out and complained to Eppel that she was working and "getting paid double" at the same time that they were short handed because of her absence. Eppel was concerned and contacted the personnel office. They advised him that her working was permissible in view of her doctor's work restriction. After that incident, Eppel told another employe that he thought that it was going to be hard for plaintiff to come back to work in his department.

During plaintiff's leave of absence, the hospital administration decided to reorganize the special procedures department. Plaintiff's position was changed from part-time to full-time to accommodate the hospital's increased workload in that department. Eppel telephoned plaintiff some time between October 3 and October 8 to advise her of the change. It was his understanding that her leave was ending and that she would be returning to work in early October.[4] He asked her to come to work the following Monday. There is considerable dispute about their conversation. Apparently, plaintiff told Eppel that she could not come back immediately. However, she did not tell him that she had had her baby on September 30 and that, because her doctor had ordered her to take six weeks postpartum leave, she would not be returning until mid-November. Eppel testified that it was his understanding of the conversation that she had turned down the full-time position. Plaintiff did not think that she had done that. Rather, it was her belief that she had only declined to return to the job before her leave of absence was over.

After Eppel's conversation with plaintiff, Eppel, Owsley and defendant Brown, the personnel supervisor, decided that the hospital should send a letter to plaintiff formally offering her the full-time job. In the letter, dated October 8, 1985, Brown informed her of the change, offered the position to her and requested that she respond. Plaintiff

---

[4] There is some confusion over when plaintiff's leave of absence had expired. The leave form indicates that it ended on October 1. However, it apparently was the understanding of some hospital staff that she would return on October 15, because her sick leave ran out August 17.

did not respond to the letter, and Brown called her on October 14. Defendants still did not know that plaintiff had given birth, or that her doctor had ordered six weeks postpartum leave. Accordingly, they still expected her back in early October. During the conversation, however, she advised Brown that she had recently had the baby, and he extended her leave to November 11, 1985. Brown testified that it was his understanding from the conversation that plaintiff had refused the full-time job. At that time, he made a notation on his copy of the October letter that she had turned down the job. Plaintiff testified that Brown told her that they had filled the position with someone else and that they did so because Eppel and Owsley did not want her in that position, because she was the mother of small children, which made her unreliable.

After the October 14 telephone conversation between Brown and plaintiff, the hospital began interviewing to fill the position. It hired Santillie, an employe in the X-ray department. On November 4, Owsley called plaintiff and offered her a job in his department as an X-ray technician. Plaintiff refused the offer, because it paid less than her job in special procedures. On November 12, 1985, Eppel filled out a hospital form for plaintiff entitled "Discontinuance of Employment." He noted on the form that her termination was "involuntary;" however, he also put down the reason code "P" which, according to the hospital's personnel policy 25-11 indicates a "failure to return after [leave of absence]," and which is classified as a "voluntary" termination.

■          Plaintiff first argues that the trial court erred in holding for defendants on her employment discrimination claim. She alleges that defendants terminated her before the end of her maternity leave and refused to reinstate her. She also alleges that she was terminated because she was on maternity leave, she was the mother of small children and defendants had one employment policy for males and another for females with small children, in violation of ORS 659.029 and ORS 659.030.[5] We review the employment discrimination claim *de*

---

[5] ORS 659.029 states, in part:

"[T]he phrase "because of sex" includes, but is not limited to, because of pregnancy, childbirth and related medical conditions or occurrences."

ORS 659.030(1)(a) states, in part:

"[I]t is an unlawful employment practice * * * [f]or an employer, because of an individual's * * * sex, * * * to refuse to hire or employ or to bar or discharge from employment such individual."

*novo. Kofoid v. Woodard Hotels, Inc.,* 78 Or App 283, 289, 716
P2d 771 (1986).

The evidence regarding plaintiff's response to the job
offer is contradictory. Plaintiff asserts that she did not turn
down the job, but simply advised her employer that she could
not begin the job before her leave had ended. Both Owsley and
Brown testified that she had refused the full-time job. In an
instance such as this, where the witness's credibility is a sig-
nificant issue, we ordinarily defer to the trial court's oppor-
tunity to see and hear the witnesses. *McCoy and McCoy,* 28 Or
App 919, 562 P2d 207, *modified,* 29 Or App 287, 563 P2d 738
(1977). We conclude that the changes in plaintiff's job were
made for legitimate business reasons. Further, we find that
plaintiff was offered the new full-time position but that she
turned it down.

Plaintiff argues that it cannot be said that she wrong-
fully refused the job offer, because the offer was conditioned
upon her returning to work immediately, which she should not
have been required to do. It is unclear whether the job offer
was conditioned on her immediate return. Both Owsley and
Brown testified that it was not and that the hospital simply
needed to know right away if she would take the position,
because it had to start training someone if she was not coming
back. However, the October 14 letter from Brown did state:
"The department tells me they will be unable to hold this full-
time position until your leave is due to expire." That would
seem to indicate that the job offer was conditioned on her
immediate return. Nonetheless, even if the job offer was so
conditioned, we conclude that that would not in itself estab-
lish that defendants' actions constituted employment discrim-
ination. At the time when the job offers were made, plaintiff's
leave of absence had technically expired or was about to
expire. Thus, if defendants did condition the offer on her
immediate return, the condition would not be unreasonable.
Further, although there is some evidence that Eppel harbored
prejudice against women with small children and might have
been upset with plaintiff for working during her leave of
absence, there is no evidence to indicate that that played any
part in the decision to change plaintiff's job or in the handling
of her return from the leave of absence. There were *bona fide,*

nondiscriminatory reasons for the job change and for the handling of her return. We are not persuaded that plaintiff's gender played a role in defendants' actions.[6]

■    Plaintiff also argues that the trial court erred in granting defendants' motion for a directed verdict on the intentional infliction of mental distress claim. A claim for intentional infliction of mental distress must be supported by allegations that, if true, would establish that the defendant intended to inflict severe mental or emotional distress, that the defendants' actions, in fact, caused the plaintiff to suffer such distress and that they consisted of an extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration. *Torgeson v. Conner,* 86 Or App 179, 738 P2d 994 (1987). Even assuming that this employment created a special relationship, *Hall v. The May Dept. Stores,* 292 Or 131, 138, 637 P2d 126 (1981), it will not avail plaintiff because she has not proved the other elements of the tort.

Giving plaintiff the benefit of all favorable evidence, as well as all favorable inferences which may reasonably be drawn therefrom, defendants' actions still do not support a claim for intentional infliction of mental distress on the facts presented at trial. The conduct was not so extreme and outrageous that a jury could reasonably find that it exceeded any reasonable limit of social toleration. *Trout v. Umatilla Co. School Dist.,* 77 Or App 95, 102-03, 712 P2d 814 (1985), *rev den* 300 Or 704 (1986); *see also Patton v. J. C. Penney Co., supra,* 301 Or at 124. The trial court properly granted the motion for directed verdict.[7]

Affirmed.

---

[6] Plaintiff asserts that the trial court should have made its own independent fact findings in the employment discrimination case that were different from the findings of the jury on the wrongful discharge claim. Defendants argue that plaintiff is estopped from asserting that. They argue that the court is bound by the findings of the jury on legal claims when it decides an equitable claim based on the same facts. In view of our disposition of the case, we need not address this issue.

[7] Plaintiff also assigns error to the court's failure to give a number of jury instructions that she requested. She argues on appeal that the instructions were necessary to explain the theory of constructive discharge to the jury. However, that theory was not pled or argued below; further, the requested instructions do not relate to constructive discharge. *See Sheets v. Knight,* 308 Or 220, 779 P2d 1000 (1989).