Argued March 5, affirmed April 23, 1969

PAKOS, *Appellant, v.* CLARK ET AL,
*Respondents.*

453 P2d 682

*Charles E. Hodges, Jr.,* Portland, argued the cause for appellant. With him on the briefs was Jon Woodside, Portland.

*Richard Roberts,* Deputy District Attorney, Portland, argued the cause for respondents. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before PERRY, Chief Justice, and SLOAN, GOODWIN, HOLMAN and HAMMOND, Justices.

HAMMOND, J. (Pro Tempore).

Plaintiff brings this action against the Sheriff of Multnomah County and five of the sheriff's deputies claiming damage arising from certain acts that he alleges caused plaintiff mental suffering and anxiety. The specific acts charged against the defendants and forming the basis for this action are:

"* * *

"V

"That the defendants did on or about the 24th day of April, 1964, maliciously do the following acts to the plaintiff;

"(1) Made statements to plaintiff that he was of unsound mind;

"(2) Made gestures to plaintiff indicating plaintiff was of unsound mind;

"(3) Threatened to incarcerate plaintiff without cause or reason;

"(4) Accused plaintiff of committing the crime of larceny

"(5) Made derogatory statements to plaintiff about plaintiff and his prior commitments;

"(6) Ridiculed plaintiff concerning the law suits presently pending against neighbors concerning the commitment of plaintiff's wife;

"(7) Ridiculed plaintiff about plaintiff's complaint against certain neighbors of plaintiff;

"(8) Represented to plaintiff that he was mentally ill;

"(9) Caused plaintiff apprehension by unduly delaying plaintiff in the Multnomah County Sheriff's Office.

"* * * *"

Plaintiff appeals from an order of involuntary nonsuit granted by the court as to each of the defendants upon their motion at the conclusion of plaintiff's case in chief. The granting of the order is the only assignment of error.

■■ In deciding this matter we are guided by the rule that a motion for nonsuit admits the truth of plaintiff's competent evidence and of every inference of fact that can be reasonably drawn therefrom; and that in considering the motion the court must view the evidence in the light most favorable to the plaintiff. *Schenk v. Lamp,* 229 Or 72, 365 P2d 1068 (1961); *Copenhagen, Inc. v. Kramer,* 224 Or 535, 356 P2d 1064 (1960).

The record reveals the plaintiff to be a 54-year-old man of Czechoslovakian extraction. During the period in controversy he operated a small farm while his wife worked for Western Union. The history of the couple's relationship with their neighbors is replete with charges and countercharges of misconduct. When the first child was born to the couple the plaintiff delivered the baby at the family home. It was reported to plaintiff later that certain neighbors were saying that he had sewed up his wife's private parts with black thread.

In 1960, after hearings in Multnomah County, Mr. and Mrs. Pakos were both committed to Eastern Oregon State Hospital. They remained at the institution about eleven months. During that period their baby was cared for at a hospital nursery. The defendant Earl Johnson first met plaintiff May 9, 1960, when plaintiff reported to him regarding an altercation in

which a number of persons were allegedly involved. The following day Johnson served plaintiff with a warrant in the insanity proceedings which resulted in the commitment above described.

Following the release of plaintiff and his wife from the state hospital and the subsequent judicial restoration of their competency they each brought actions against a number of defendants, mostly neighbors of the plaintiff, seeking a total of two million dollars ($2,000,000) in damages for injuries allegedly flowing from the commitments. In the instant case plaintiff claims that the commitment, and the following law suits acted to furnish notice to these defendants of plaintiff's sensitivity.

On April 20, 1964 the defendant Danielson, as deputy sheriff, visited plaintiff at his home and inquired of plaintiff regarding a report made to him that plaintiff had on that date stolen two flats of petunias from a store. Plaintiff denied the theft and Danielson returned later the same day with a clerk from the store and further inquiry was made of plaintiff regarding the complaint. No arrest was made and there is no record of a charge being filed in any court. Plaintiff testified that he telephoned the sheriff's office several times on April 23 to determine whether a warrant had been issued for his arrest because of the alleged theft. He relates that he talked to an officer on one call whose conversation he recalled as follows:

> "A  He identified himself as Don Larson, administrative assistant to Don Clark, and he said, 'Mr. Pakos, we can't tell you whether there is a warrant for you or not. You must come down to the courthouse to see about that.' And he said that I was to go to the traffic office the next morning at 8 o'clock, and he said it would be taken care of there. Then I was to return and let him know how I came out."

The following morning, April 24, 1964, plaintiff drove his wife to her employment at Western Union and also took with him the couple's first child, now six years old, and their three-month-old daughter. Mrs. Pakos was left at her place of employment at about 6:45 a.m. and plaintiff then drove directly to the county courthouse, taking the children with him, the baby being carried in a plastic carrier.

Plaintiff says that he went first to the office of defendant Donald E. Clark, the then sheriff. He saw a light in the office and spoke to an unidentified man. Pakos relates that he received these instructions from that person:

"A He said, 'Mr. Pakos, it's about that flower deal.' He said, 'The man that came to your house was Officer Zornado, and you go right on upstairs. They are waiting for you.'

"And I told him, 'I was told that they opened up at 8 o'clock.'

"And he says, 'No. You go right on up. They are waiting for you.'"

Plaintiff says that as directed he went to the traffic office on the eighth floor of the courthouse and there met the defendant Lieutenant Quinlin to whom he stated that he had been told to come there "in regard to whether there was a warrant or not," to which Quinlin replied, " 'Before we can go any further, we have to find out who the man was that came out to your place.'"

Pakos states that Lieutenant Quinlin brought in Officer Zornado and then Officer Pierce (one of the defendants) and each time plaintiff said, "that wasn't the man." He then recalls that the defendant Danielson came into the room at 8:30 a.m. and "I asked him

his name, and he said, 'My name is Beovich.'" It is contended that Danielson thereby misrepresented himself.

The evidence indicates that Pakos was at the sheriff's office a total of about three hours. He describes his conduct as patiently waiting, talking calmly to officers and inquiring whether there was a warrant for his arrest. He left the courthouse at least once during this period to put money in a parking meter. He does not contend that he was detained against his will, but simply that he could not get the information he came for.

The sheriff's deputies who were called as adverse party witnesses described Pakos's conduct as disturbed, threatening, wildly gesturing, accusatory and, "He was yelling and swearing, and you name it."

Plaintiff's complaint about the conduct of the defendant Johnson is described in his testimony as follows:

> "Q  Well, first of all, did you have any more conversation with Earl Johnson? Did you have any conversation with him that day?
>
> "A  I did at the tail end of the waiting period.
>
> "Q  What happened when Earl Johnson came there?
>
> "A  Lieutenant Quinlin had again gone over to the Criminal Division. He didn't come back. But Mr. Earl Johnson came in, and he said to me, he said, 'You are crazy as a bedbug. I am going to get ahold of somebody and I'm going to have you put right back in the insane asylum at Pendleton where you were before. I'm going to take these children and turn them over to the juvenile authorities.'
>
> "And I tried to explain to Mr. Johnson that I was there on legitimate business, that I was there to see about a warrant, and I said to Mr. Johnson,

'If you can do that on your own, that would show corruption.'

"When I said that, he started raging and hollering and police officers came from every direction. They had him surrounded. They were saying, 'No, Earl, don't do that. Please let him go. No, please, Earl, don't lose your head. Let the man go.'"

Johnson describes the incident as one in which he was trying to humor Pakos and quiet him down; to get his attorney and come back. He states that after Pakos had ranted and raved for nearly an hour he decided that he should have a mental hearing and that he signed the necessary papers in the Mental Health Department for that purpose. Officer Danielson also signed the papers.

Plaintiff testified that after his experience with the defendant Johnson he went down the stairway to the office of defendant Rocks on the first floor of the courthouse. Rocks was Administrative Assistant to Sheriff Clark. He relates his experience with Rocks as follows:

"A  I asked Mr. Rocks if he could help me out in regard to that matter.

"Q  Now, what did Mr. Rocks do or say?

"*    *    *    *    *

"A  He said he had something very important to talk about and started questioning me about my wife's movements after she got off working up to the bus depot in regard to getting into cars with men.

"Q  And what else happened?

"A  As Mr. Rocks was having this conversation, he would lean over the desk and puff out his cheeks and bulge his eyes at me.

"Q Now, could you describe the motions that he made or the gestures that he made?

"A Well, he blew his cheeks full of air and—

"Q Could you just demonstrate that to the jury.

"A He'd go—he was sitting like this and he'd get up like this over to where I was sitting. He'd go like that (indicating) at me.

"Q And what effect did this have upon you, if anything?

"A Well, it made me very nervous and frustrated.

"Q And how long did this go on, Mr. Pakos?

"A He did that about—I'd say about seven or eight times."

Pakos further testified that during his encounter with Rocks the defendant Johnson was standing against the wall with his arms folded and Rocks and Johnson were nodding their heads back and forth at each other. Plaintiff then states that he left Rocks's office and walked out to his parked car where he was again approached by Johnson who asked him to come back to the courthouse. He was taken to the eighth floor where he was met by his then attorney with whom he had a discussion. Shortly thereafter Johnson reappeared and served a warrant upon Pakos, which warrant was issued in the insanity proceeding instituted by Johnson and Danielson. Pakos was placed in restraints and transported by Johnson and Danielson to Morningside Hospital, there to await a hearing upon the question of his sanity.

Plaintiff describes a conversation between him and defendants Johnson and Danielson on the way to the hospital that involved the reported theft of the petunias, the reports that he had sewed his wife up with

black thread and the law suit against Pakos's neighbors. Plaintiff testified that he started the conversation and made no claim in his testimony that it was distressing to him.

This is a matter of first impression in Oregon and is distinguished from previously decided cases wherein mental suffering was the direct and natural result of the commission of another tort as in *Douglas v. Humble Oil*, 251 Or 310, 445 P2d 590 (1968) (trespass and conversion); *Hovis v. City of Burns*, 243 Or 607, 612-613, 415 P2d 29 (1966) (unauthorized removal of a grave); *Hinish v. Meier & Frank Co.*, 166 Or 482, 506, 113 P2d 438, 138 ALR 1 (1941) (invasion of privacy).

Plaintiff contends that this action falls within the purview of the rule expressed in Restatement (Second), 1 Torts 71, § 46, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress * * *." Defendants do not question the validity of the rule but contend that under the evidence presented it is not applicable to this case.

To understand the import of the Restatement rule we must refer to comment thereon supplied by the American Law Institute. The first explanatory comment pertinent to the instant problem is set forth in Restatement (Second), 1 Torts, § 46, comment *d* at 72, 73, as follows:

> "*Extreme and outrageous conduct*. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggra-

vation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous !'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam  *  *  *."

But plaintiff says that his position is supported by the fact that the persons he accuses of tortious conduct were police officers and their actions amounted to an abuse of their position so that the matter comes within the scope of a further comment which states:

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. Thus an attempt to extort money by a threat of arrest may make the actor liable even where the arrest, or the threat alone, would not do so. In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse

of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not exreme or outrageous." Restatement (Second), 1 Torts § 46, comment e at 74.

The type of problem contemplated by the last-cited comment is one described by the decision, relied strongly upon by plaintiff, in *Savage v. Boies*, 77 Ariz 355, 272 P2d 349 (1954). In that case a petition had been filed alleging that the plaintiff was mentally ill and required emergency apprehension. An order was entered requiring the sheriff to arrest and detain the plaintiff in the county hospital pending further order of the court. Plaintiff testified that she was the mother of a seven-months-old baby who was in the present custody of plaintiff's estranged husband. She stated that the defendant police officers came to her stating that her baby and husband were both at the county hospital and that they had been critically injured in a car accident; "that as a result of this she went all to pieces and was very much upset; that the officers invited her to go with them to the hospital; that upon arrival she discovered the child was not there and one of the police officers told her; 'We just had to tell you that in order to get you down here.'" The court applied the Restatement rule then existing in Restatement, 1 Torts 612, § 46 (1948 Supp), to wit: "One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress   *   *   *." In reversing the trial court's order directing a verdict for defendants, the court in that case said that a jury would be justified in finding that emotional distress, as such term is used in the Restatement rule, is substantially certain to be produced by the conduct complained of and

the question as to whether it did in fact cause emotional distress and whether it was of such severity as to entitle plaintiff to damages should have been submitted to the jury. See *Spackman v. Good,* 245 Cal App 2d 518, 54 Cal Rptr 78 (1966); *State Rubbish Etc. Assn. v. Siliznoff,* 38 Cal 2d 330, 240 P2d 282 (1952). See also Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv L Rev 1033 (1935-1936), and Wade, *Tort Liability for Abusive and Insulting Language,* 4 Vand L Rev 63, 82 (1950-51).

It is important here to note the evolutionary process that brought about the rule of law under which this action is brought. It is best explained in Restatement (Second), 1 Torts, § 46 at 21 (Tent. Draft No. 1, 1957) as follows:

> "*Note to Institute:* In its original form, § 46 stated flatly that there was no liability for the intentional infliction of emotional distress, or for bodily harm resulting from it, except in cases of assault and of the special liability of carriers covered in § 48.
>
> "In the 1948 Supplement this position was reversed, and the Section was redrawn, and the Comments completely rewritten * * *.
>
> "The rapid development of this 'new tort,' and the numerous cases in which it has appeared, even since the 1948 revision, have indicated the need for *a more limited statement which will set some boundaries to the liability, falling short of the broad statement made in the Section as it now stands.* The Comments have again been rewritten, retaining the general approach and much of the language of the 1948 revision, but indicating the results of the cases to date * * *." (Second Emphasis Supplied.)

Thus from a denial of liability for intentionally inflicting emotional distress the Restatement and courts

supporting it (*Savage v. Boies,* supra) drastically changed to the allowance of liability against one who intentionally caused emotional distress without privilege to do so, and later to the present rule which requires that the conduct be extreme and outrageous before liability will attach.

The legal history of the problem and its ramifications are extensively covered in Prosser, Torts, § 11 at 48, 49 (3d ed 1964), wherein, after explaining the development of the current rule requiring "extreme and outrageous conduct intentionally or recklessly cause[d] * * *" it is stated (pp 48, 49):

> "So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Such extreme outrage has been found, as in the leading Wilkinson case, in decoying a woman suspected of insanity to a hospital by a concocted tale of an injured husband and child; in spreading the false rumor that the plaintiff's son had hanged himself; in bringing a mob to the plaintiff's door at night with a threat to lynch him unless he left town; and in wrapping up a very gory dead rat instead of a loaf of bread, for a sensitive soul to open. The invitation to a woman to illicit intercourse, insufficient in itself, becomes extreme outrage when it is prolonged or repeated to the point of hounding, and accompanied by advertising in the form of indecent pictures or exposure."

As noted above, plaintiff contends that he is peculiarly susceptible to emotional distress and is unusually sensitive and that defendants had notice thereof from reports of his numerous problems with his neigh-bors, his prior commitment to the state hospital and

the following actions filed by Pakos and his wife against his neighbors seeking damages. An examination of the record reveals that at the time of and following the service upon him of the warrant in the mental proceeding the plaintiff was described by his former attorney as being remarkably calm considering the circumstances, somewhat excited but in control of himself and concerned about his children who were then under the care of a matron and not with plaintiff. When asked to describe what he had observed of Pakos the attorney who had represented him in other matters replied:

"A Well, yes. First of all, I would say that Mr. Pakos has a somewhat limited education, and is perhaps slightly limited intellectually; in other words, he hasn't the benefit of an extremely high IQ, or perhaps average. He has an extremely intense memory. I have never run across anybody with a memory quite like Mr. Pakos'. He can recall incidents, events, and names in such a fantastic way that I have always been impressed by this particular ability. He is a very neat and a very orderly man, has a very clean home. He is a wonderful gardener. He grows crops like nobody I have even seen before. He had a small area where he lived, and it was half of it in garden. It was just beautiful. He is—has sort of a single-track mind; in other words, when you talk to Mr. Pakos, you stay on the subject. You don't wander. He limits himself to the particular area that he has under discussion. He is an extremely calm person. Under even the most straining circumstances, he manages to maintain his dignity and his calmness. This is about as good a thumbnail sketch as I can give you."

Plaintiff offered the thesis, by the evidence presented, that his neighbors unjustly caused his first commitment to the state hospital and therefore he had

a cause of action against them; and that the turmoil in the neighborhood was the fault of his neighbors while his decorum was above reproach, and yet he asks this court to now believe that such circumstances indicate an unusual sensitiveness on the part of plaintiff of which the defendants had notice so that their conduct became extreme and outrageous when considered in light of plaintiff's mental condition or peculiarity.

Plaintiff was committed to the state hospital subsequent to the April 24, 1964 episode of which he here complains, but, contrary to any inference of his mental condition that might be drawn therefrom, plaintiff offered one witness who testified that he was "absolutely not" mentally ill at the time of the service of the warrant upon him and another who testified that plaintiff was completely rational while in the state hospital. Neither the background of plaintiff's problems as they were so portrayed nor his attorney's analysis of his personality depicts a highly sensitive person to whom defendants owed an extra duty.

■ The investigation by Officer Danielson of the complaint that Pakos had stolen some flats of petunias was routine and uneventful except for plaintiff's claim that the officer accused him of stealing the flowers. That episode in the series of acts complained of by Pakos and in the setting described by the witnesses does not meet the criteria of extreme and outrageous conduct required by the rule stated and explained above.

Plaintiff concedes in his brief filed with this court that he is not contesting the commitment to the state hospital which followed the April 24, 1964 events.

■ The view most favorable to plaintiff of the conduct of defendants Quinlin, Pierce and Danielson at the

sheriff's office on April 24 is that they were present and a part of the general scene that plaintiff claims distressed him, and that they did not furnish Pakos with the information he sought regarding the existence or nonexistence of a warrant for his arrest. An ordinary person would not be prompted to exclaim "Outrageous" of the conduct described (Restatement (Second), 1 Torts 73, § 46, comment *d*, supra). No cause of action against these defendants was stated.

Remaining for our consideration is plaintiff's description of the conduct of the defendants Johnson and Rocks and the vicarious liability, if any, of the defendant Clark, as sheriff. (ORS 204.685(3).)

■ While for the purposes of this decision we must consider as true the testimony given by Pakos regarding the conduct of Johnson and Rocks, such testimony is not to be considered in a sterile setting and detached from the admitted surroundings in which the alleged acts occurred. The picture portrayed by the record is that of a man who was accused of stealing from a store becoming very concerned as to whether a warrant had been issued for his arrest and making numerous phone calls to the sheriff's office to inquire about the existence of a warrant, then later going to the sheriff's office before 7:00 a.m. with two small children and insisting for approximately three hours that he be given the information he sought. The record reveals that he was never detained until the warrant was eventually served on him, that he was encouraged to leave, and did in fact leave the office once or twice only to return on his own volition to continue his inquiry. He contended that he did not know the identity of the officer who came to his home investigating the complaint about the stolen flowers, but when telling

of his conversation with the officer he relates saying to that officer, " 'Now, Officer Danielson, possibly you have a legal paper on you that it will tell  *  *. *' " and later regarding the same conversation he testifies:

"And, well, I said, 'Officer Danielson, I'd gone to the store, I bought the tray of petunias. I didn't take anything—any,' and I tried to make him understand that I was up there, had bought the petunias."

Plaintiff testified that he talked freely with the defendants about stories his neighbors were telling about his sewing his wife up with black thread. His only complaint is that the officers brought the subject up.

Regarding the injury plaintiff claims to have suffered, his testimony was that when Danielson allegedly said, " 'My name is Beovich' " this made him frustrated; that when he went back to the first floor of the courthouse and attempted without success to talk to his then attorney whom he met in the hall, "I was all frantic and upset"; that when he was taken to Morningside Hospital his reaction was, "Well, I was in such a nervous state that I had a great difficulty even talking.  *  *  * I was in a very frustrated state of mind."

In spite of the concession that no contest is made of plaintiff's commitment to the state hospital his motives for bringing the action and his claimed injury were also described by Pakos in this testimony: .

"Q Do you recall earlier this year on September 25, 1967, when I took your deposition?

"A Yeah.

"* * * * *

"Q And do you recall my asking you this question? I asked this question: 'What specifically did the deputy sheriffs do to cause the grief and anxiety that you described?'

"Do you recall making this answer?

"* * * * *

"Q (By Mr. Roberts) Well, that was the question. Do you recall making this answer? 'They had me committed to an insane asylum and they frightened me in the courthouse.'

"Do you recall my asking this question?

" 'Q Mr. Pakos, isn't that what this boils down to, the fact that these men testified against you at the mental hearing? Isn't that why you are bringing this lawsuit?

"A No, no, no, it's not.

"Q It isn't?

"A No. It is the suffering I endured.

"Q When?

"A Down at the State Hospital. I couldn't - - - -

"Q How were they responsible for your suffering at the State Hospital?

"A By their testimony having putting me in.

"Q By their testimony?

"A Yeah, and signing the papers to have me put in there.'

"Q Do you recall making those answers to those questions?

"A Yes. That's true. That is what happened. But it isn't why I brought this lawsuit against them.

" " * * * *

"Q Mr. Pakos, why did you bring this lawsuit?

"A So it won't happen to some other American family. So it will discontinue happening to my family.

"Q Now, Mr. Pakos, did you suffer as a result of their acts in the State Hospital?

"A Yes, I did. I thought I was going out of my mind."

■■ As is stated in Prosser, Torts, § 11 at 51 (3d ed 1964), "The emotional distress must in fact exist, and it must be severe." Plaintiff's reaction to his commitment to the state hospital and his anxiety over be-

ing detained after service of the warrant and prior to a hearing upon his mental condition are not issues in this case. His stated reaction to the other episodes which he describes indicate no severe distress, nor can Pakos's description of the conduct of Johnson or Rocks be interpreted as "extreme and outrageous conduct."

Such conduct may have been annoying or even insulting; it may have been an indignity to plaintiff and conduct unbecoming peace officers, but considered in light of the rule governing this type of claim the conduct complained of is not actionable. Restatement (Second), 1 Torts 71, § 46, supra.

■ It was for the trial court to determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If the minds of reasonable men would not differ on the subject the court was obliged to grant an order of involuntary nonsuit, which in this case was done.

Affirmed.