Argued and submitted May 15, affirmed in part, reversed in part and remanded October 9, Patton's reconsideration and J. C. Penney's reconsideration denied December 6, 1985, both petitions for review allowed February 11, 1986 (300 Or 545)

# PATTON,
*Appellant,*

*v.*

# J. C. PENNEY CO., INC. et al,
*Respondents.*

(83-11-221; CA A33254)

707 P2d 1256

James J. Roberson, Lake Oswego, argued the cause and filed the briefs for appellant.

Jeffrey M. Batchelor, Portland, argued the cause for respondents. With him on the brief were Richard F. Liebman, and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Newman, Judges.

VAN HOOMISSEN, J.

Gillette, P. J., concurring in part; dissenting in part.

## VAN HOOMISSEN, J.

This is an action for wrongful discharge and outrageous conduct. Plaintiff appeals from a judgment dismissing his complaint for failure to state a claim. ORCP 21A.[1] The dispositive issue is whether the complaint, construed under the assumption that the well-pleaded facts are true, states a claim. That is a question of law. *See Paddack v. McDonald,* 294 Or 667, 672, 661 P2d 545 (1983); *See Turrini v. Gulick,* 16 Or App 167, 169, 517 P2d 1230, *rev den* (1974); We affirm in part, reverse in part and remand.

Plaintiff was hired by defendant J.C. Penney Co. in 1969. He worked in Eugene until 1980. His last two years there were as a merchandising manager. He was then transferred to Portland, where he continued to work as a merchandising manager. Throughout his employment, he discharged his duties in a satisfactory manner. In 1981, he received the "Merchant of the Year" award in his store, and he earned the "Merchant of the Month" award in October, 1981, and January, 1982. In November and December, 1981, he also came close to earning that award.

In October, 1981, defendant McKay, J.C. Penney's store manager, told plaintiff to discontinue a social relationship with a female co-worker. J.C. Penney has no general policy prohibiting socializing among employes. Plaintiff told McKay that he did not socialize with the co-worker at work and that he intended to continue the relationship. Plaintiff had the co-worker transferred to another department within the store with which he was not connected. McKay asked plaintiff's other co-workers if plaintiff had broken off the relationship. He intimated to them that that was necessary if plaintiff wanted to continue working. That information was given to plaintiff by his co-workers, but not by McKay.

Plaintiff continued seeing the co-worker. In late 1981, McKay warned plaintiff that his job performance was

---

[1] The order first appealed from indicated that the defendants' motion to dismiss plaintiff's amended complaint was granted. We dismissed the appeal, because that order was not a final judgment. A judgment was then entered, and this appeal was filed. However, that judgment indicates that defendants' motion for summary judgment was granted and the action dismissed. The record does not disclose that defendants ever moved for summary judgment. We assume that the trial court meant only to repeat its earlier action in granting defendants' motion to dismiss.

unsatisfactory and that he would be terminated if there was no improvement. Plaintiff's request for a transfer to another store was denied. In February, 1982, McKay terminated plaintiff for unsatisfactory job performance. Defendant Chapin, J.C. Penney's district manager, approved the termination. After he was terminated, plaintiff and the co-worker were married. At the time he terminated plaintiff, McKay knew that plaintiff was responsible for the support of three children.

Plaintiff first assigns as error the dismissal of his claim for wrongful termination. He argues that defendants infringed interests of sufficient societal importance to justify an exception to the general rule that no action can be brought for terminating an at will employe. Defendants argue that plaintiff has not pleaded facts showing any constitutional or statutory violation and, thus, has not shown an interest of sufficient societal importance to justify a cause of action in tort.

■ Generally, in the absence of a contractual, statutory or constitutional requirement, an employer may discharge an employe at any time and for any reason, or no reason at all. *Simpson v. Western Graphics,* 293 Or 96, 99, 643 P2d 1276 (1982); *Nees v. Hocks,* 272 Or 210, 216, 536 P2d 512 (1975).

■ There are public policy exceptions to this general rule. The first concerns termination for fulfilling a societal obligation so that the termination thwarts an important public interest. In *Nees v. Hocks, supra,* an employe was discharged for serving on a jury. The Supreme Court held that the employer was liable in damages for discharging the plaintiff because she served on the jury. In *Delaney v. Taco Time Int'l,* 297 Or 10, 17, 681 P2d 114 (1984), a restaurant manager was terminated for refusing to sign a libelous and false statement of reasons for the discharge of another employe. The Supreme Court found that people have an obligation, rooted in the Oregon Constitution, not to defame others. *Delaney v. Taco Time Int'l, supra; see Petermann v. International Brotherhood of Teamsters,* 174 Cal App 2d 184, 344 P2d 25 (1959).

■ The second exception concerns termination for pursuing a statutory right directly related to the plaintiff's role as an employe. In *Brown v. Transcon Lines,* 284 Or 597, 588 P2d

1087 (1978), an employe was discharged for filing a workers' compensation claim. The Supreme Court held that the complaint stated a claim, because ORS 659.410, which makes discrimination against an employe who files a workers' compensation claim an unlawful employment practice, constitutes legislative recognition of an important and protectable *public* policy. *See Holien v. Sears Roebuck and Co.,* 298 Or 76, 689 P2d 1292 (1984); *McQuary v. Bel Air Convalescent Home, Inc.,* 69 Or App 107, 684 P2d 21 (1984); *compare Campbell v. Ford Industries, Inc.,* 274 Or 243, 546 P2d 141 (1976) (employe discharged for exercising statutory right to inspect corporate records failed to state cause of action).

In *Delaney v. Taco Time Int'l, supra,* the Supreme Court explained that under some circumstances no action will lie even though termination frustrates an important social interest, because the employe has an adequate administrative remedy that protects the interest of society. *See Walsh v. Consolidated Freightways,* 278 Or 347, 563 P2d 1205 (1977). Plaintiff concedes that in socializing with a co-worker, he was not engaged in the performance of a societal obligation and that his conduct in that regard is not protected by a statute. He argues, however, that he is protected by constitutional rights to privacy and association and that, when defendants terminated him, they violated those rights.[2] Although he argues that his interest in social dating is a constitutionally protected privacy and associational interest, he cites no authority on point. He relies instead on *Eisenstadt v. Baird,* 405 US 438, 92 S Ct 1029, 31 L Ed 2d 349 (1972), and *Loving v. Virginia,* 388 US 1, 87 S Ct 1817, 18 L Ed 2d 1010 (1967), cases which involve state action restricting marriage and the decision whether to bear children. Plaintiff does not allege any state action in this case.

We conclude that plaintiff has failed to allege interference with an interest of such public importance that the general rule concerning employment at will should not apply.[3]

---

[2] Plaintiff also argues that the court in *Delaney* implied a third exception to the employment-at-will doctrine where the termination frustrates some important social interest but no adequate alternative remedy exists. *See Walsh v. Consolidated Freightways, supra.* We disagree.

[3] In *Brockmeyer v. Dun & Bradstreet,* 113 Wis 2d 561, 335 NW2d 834 (1983), the Wisconsin Supreme Court denied a cause of action for wrongful termination to an at

The trial court was correct in dismissing plaintiff's wrongful termination claim.

Plaintiff next assigns as error the dismissal of his claim for outrageous conduct. He argues that the facts pleaded show that defendants intended to inflict emotional distress on him. Defendants argue that a reasonable jury could not find that the conduct here was intolerable social behavior. *See Hall v. The May Dept. Stores,* 292 Or 131, 137, 637 P2d 126 (1981).

In *Bodewig v. K-Mart, Inc.,* 54 Or App 480, 635 P2d 657 (1981), *rev den* 292 Or 450 (1982), we determined that an employer and an employe stand in a special relationship for purposes of the tort of outrageous conduct.[4] We stated:

"An employer has even more authority over an employe, who, by the nature of the relationship, is subject to the direction and control of the employer and may be discharged for any or no reason, absent an agreement restricting that authority. Clearly, that relationship is not an arm's length one

---

will employe who was terminated, in part, for socializing with a co-worker. The court stated:

"A plaintiff-employee alleging a wrongful discharge has the burden of proving that the dismissal violates a clear mandate of public policy. Unless the employee can identify a specific declaration of public policy, no cause of action has been stated. The determination of whether the public policy asserted is a well-defined and fundamental one is an issue of law and is to be made by the trial court. Once the plaintiff has demonstrated that the conduct that caused the discharge was consistent with a clear and compelling public policy, the burden of proof then shifts to the defendant employer to prove that the dismissal was for just cause.

"We believe that the adoption of a narrowly circumscribed public policy exception properly balances the interests of employees, employers and the public. Employee job security interests are safeguarded against employer actions that undermine fundamental policy preferences. Employers retain sufficient flexibility to make needed personnel decisions in order to adapt to changing economic conditions. Society also benefits from our holding in a number of ways. A more stable job market is achieved. Well-established public policies are advanced. Finally, the public is protected against frivolous lawsuits since courts will be able to screen cases on motions to dismiss for failure to state a claim or for summary judgment if the discharged employee cannot allege a clear expression of public policy." 335 NW2d at 840.

*See Staats v. Ohio Nat'l. Life Ins.,* ___ F Supp ___ (118 LRRM 3242)(WD Pa 1985); *Rogers v. Int'l Bus. Machines,* 500 F Supp 867 (WD Pa 1980); *Crosier v. United Parcel Service, Inc.,* 150 Cal App 3d 1132, 198 Cal Rptr 361 (1983).

[4] Defendants rely on *Pakos v. Clark,* 253 Or 113, 453 P2d 682 (1969) and *Christofferson v. Church of Scientology,* 57 Or App 203, 644 P2d 577, *rev den* 293 Or 456 (1982). Those cases do not involve the special relationship shown here.

between strangers. Accordingly, we conclude that the relationship between plaintiff and K-Mart was a special relationship, based on which liability may be imposed if K-Mart's conduct, though not deliberately aimed at causing emotional distress, was such that a jury might find it to be beyond the limits of social toleration and reckless of the conduct's predictable effects on plaintiff." *Bodewig v. K-Mart, Inc., supra,* 54 Or App at 486.

We held that the trial court erred in granting summary judgment for the defendants. We concluded that issues of fact were presented concerning whether the defendant's manager's conduct, *i.e.,* subjecting plaintiff to a strip search to satisfy an unreasonable customer who had mistakenly accused her of stealing, exceeded the bounds of social toleration and was in reckless disregard of its predictable effects on plaintiff. *See Brewer v. Erwin,* 287 Or 435, 600 P2d 398 (1979).

In *Hall v. The May Dept. Stores, supra,* the Supreme Court held that the plaintiff, a sales clerk, had stated a claim for outrageous conduct when she was unjustifiably accused of stealing and was told that she would go to prison if she did not confess. The court held that a jury could infer that the "method of interrogation was an extraordinary transgression of contemporary standards of civilized conduct toward an employee." 292 Or at 141.

Taking plaintiff's well-pleaded facts as true, the record shows that plaintiff was told that he must discontinue a social relationship with a co-worker, even though it was conducted away from work and violated none of the employer's policies. When plaintiff refused to terminate the relationship, his manager became angry, questioned plaintiff's co-workers about the relationship, intimated to them that plaintiff would lose his job if the relationship continued and did not directly inform plaintiff of this fact. Plaintiff, an otherwise exemplary employe, allegedly was terminated solely for refusing to discontinue a social relationship that had no demonstrable adverse effect on his job performance. His termination notice indicated, however, that he was terminated for unsatisfactory job performance. That could affect his future employability. When he terminated plaintiff, McKay knew that plaintiff would forfeit his retirement benefits that had accrued after 12 years of employment.

■ We conclude that a jury could find that defendants exceeded the bounds of social toleration when they terminated plaintiff's employment and that they acted with a reckless disregard of the predictable effects of their action on plaintiff. *Bodewig v. K-Mart, Inc., supra.* The trial court erred in dismissing plaintiff's outrageous conduct claim.

Affirmed as to plaintiff's wrongful termination claim; reversed as to plaintiff's outrageous conduct claim; and remanded.

**GILLETTE, P. J.,** concurring in part; dissenting in part.

I join fully in the court's disposition of plaintiff's wrongful termination claim. However, I decline to join in the disposition of the outrageous conduct claim, because I do not feel that it is required by *Hall v. The May Dept. Stores,* 292 Or 131, 637 P2d 126 (1981), or any other precedent.

There is no satisfactory shorthand method of outlining the tort of "outrageous conduct" or "intentional infliction of mental suffering"—a tort that "is still in the process of developing in this state." *Christofferson v. Church of Scientology,* 57 Or App 203, 209, 644 P2d 577, *rev den* 293 Or 456 (1982). Judge Linde explained its origins, development and elements this way in *Hall:*

> "Plaintiff's claim rests on a tort theory which Professor William Prosser synthesized from scattered cases allowing recovery for mental distress in a variety of factual settings. Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich L Rev 874 (1939); *see* White, *Tort Law in America* 102-106 (1980). In such an effort to describe divergent factual patterns as instances of a single tort, it is not easy to define the elements of the tort so as to fit all cases. As appears from the title given it in Prosser's article, however, and later embraced in the Restatement of Torts § 46, 'Conduct Intended to Cause Emotional Distress Only,' (1948 Supp 612-616), the theory of plaintiff's claim belongs among the intentional torts. Like most torts, it is marked by the elements of a defendant's state of mind, the character of the defendant's act that causes the plaintiff's injury, the nature of plaintiff's injury, and under some circumstances the relationship between plaintiff and defendant. *See Brewer v. Erwin,* 287 Or 435, 454-458, 600 P2d 398 (1979).

"In the cases, the element of defendant's 'intent' ranges from a calculated purpose to inflict mental or emotional distress because of personal hostility, or for some impersonal purpose like the debt collection methods in *Turman v. Central Billing Bureau, Inc.*, 279 Or 443, 568 P2d 1382 (1977), through the mindless 'amusement' of practical jokes as in the leading case of *Wilkinson v. Downton*, [1897] 2 Q.B. 57, to encompass also the intent to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself, as this court found in the case of a physician who turned away accident victims seeking his help. *Rockhill v. Pollard*, 259 Or 54, 485 P2d 28 (1971). Lack of foresight, indifference to possible distress, even gross negligence is not enough to support this theory of recovery.

"Apart from intent, defendant's act must in fact cause plaintiff mental or emotional distress of a severe and serious kind; the tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability. Similarly, insults, harsh or intimidating words, or rude behavior ordinarily do not result in liability for damages even when intended to cause distress. Contemporary standards of civility hardly allow turning every case of justified indignation into an action for financial recompense. *See Brewer v. Erwin, supra*, 287 Or at 457, 600 P2d 398 (1979), *Pakos v. Clark*, 253 Or 113, 132, 453 P2d 682 (1969). The tort requires some extraordinary transgression of the bounds of socially tolerable conduct.

"In attempting to articulate what separates actionable conduct from the ordinary run of crudely aggressive, overbearing, or ill-tempered behavior, Prosser and the Restatement turned to adjectives like 'outrageous' and 'extreme.' These are not words of art; other words or phrases could serve as well. All are designed only to express the outer end of some gradation or scale of impropriety and social disapproval. No more can be conveyed by defining one epithet by another." 292 Or at 134.

After defining the tort, the court in *Hall* turned to application of the law to the facts before it:

"The crux of plaintiff's claim is that defendant Rummell, as director of security of Meier & Frank Co., accused plaintiff of stealing money and threatened her with prosecution and imprisonment in a manner designed to frighten her and make her an example for other employees, that Rummell made the

accusation regardless of his actual belief as to her guilt or innocence and that subsequently she was put under surveillance and was denied the opportunity to sell merchandise successfully so that eventually she had to quit her job." 292 Or at 139.

In conducting its analysis, however, the court took great care to distinguish between those matters cognizable as part of the tort and those matters that were not pertinent:

"[Plaintiff had alleged that defendants' conduct was actionable in part because their accusations against plaintiff were based on certain charts Rummell had prepared to show the frequency with which cash register shortages corresponded with the use of that register by a particular employee.] We focus particularly on whether the jury could find that Rummell attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part. *Two other charges made by plaintiff have no independent force to establish this tort. Asserted weaknesses of the charting system would not be in point divorced from its intentional use as a psychological instrument in confrontations with suspected employees. Also, the decisions concerning plaintiff's work assignments subsequent to the episode were not the kind of acts encompassed by this tort.*" 292 Or at 139. (Emphasis supplied.)

The court then went on to find that the relevant evidence raised a jury question as to whether defendants had committed the tort. With the court's methodology in mind, I now turn to the question in this case.

This is a pleading case. The issue is whether the well-pled facts in plaintiff's complaint make out a claim for intentional infliction of emotional distress. Plaintiff alleged, in pertinent part:

"VIII

"On or about October 14, 1981, Defendant McKay instructed Plaintiff that Plaintiff was to discontinue a social relationship with a certain female co-employee of the Clackamas Town Center Penney store; Plaintiff advised Defendant McKay that he did not socialize with this co-employee during business hours, however, Plaintiff asserted his intentions to carry on a social relationship with this co-employee outside of business hours and away from the Penney

store; Defendant McKay was made angry and resentful toward Plaintiff by this assertion."

The majority holds—and I agree—that discharging him because his supervisor did not approve of plaintiff's relationship with a co-employe is not actionable on a theory of wrongful discharge. It would seem self-evident, then, that directing plaintiff to discontinue the relationship (in lieu of permissibly firing him) must not be actionable, either. I conclude that the events recited in paragraph VIII are not actionable.

"X

"Defendant McKay after the communication to Plaintiff alleged in Paragraph VIII hereof, frequently asked Plaintiff's co-employees if Plaintiff was still socializing with this female co-employee and when told that Plaintiff was still socializing with her, Defendant McKay would comment to the effect that if Plaintiff wished to remain employed he would break off the relationship; these inquiries and comments were duly reported to Plaintiff, as was Defendant McKay's intention."

What was said about paragraph VIII applies equally here.

"XI

"Plaintiff continued to assert his right to socialize with this co-employee outside the business hours and away from the store, and Defendant McKay thus became increasingly angry and resentful toward Plaintiff."

One would suppose so. McKay, once embarked on his churlish course, was not likely to desist. Still, those allegations only establish McKay's state of mind. No impermissible conduct is alleged.

"XII

"At no time during Plaintiff's employment with Defendant Penney was there any written or unwritten policy, rule or regulation proscribing intra-company and intra-store fraternization between employees.

"XIII

"Although Plaintiff's job performance was exceptionally good, Defendant McKay eventually, in the very late part of 1981, warned Plaintiff that Plaintiff's job performance was unsatisfactory and if improvement was not shown, Plaintiff would be terminated."

The lack of any written policy on intra-company fraternization is not pertinent if plaintiff, as an at will employe, could be fired on any basis at all. To turn this lack of written policy into an allegation supporting an outrageous conduct claim substantially destroys the at will doctrine. Similarly, calling plaintiff a poor worker when he was a good one had better not be actionable in these circumstances. An at will employe may be terminated for any reason, even one that would seem wholly unsupportable to fair minded persons. How can merely threatening to do that which is not actionable if done give rise to a cause of action?

## "XIV

"Although Plaintiff requested a transfer to another Penney store, as part of an effort to avoid further confrontation with Defendant McKay and to preserve his employment interest with the Penney Co., this request was wrongfully and maliciously denied by Defendant McKay, and on or about February 1, 1982, Defendant McKay, acting within the scope of his employment dismissed Plaintiff; the basis for this dismissal as given by Defendant McKay was unsatisfactory job performance."

The employer did not have to retain or transfer this employe.

## "XVIII

"At the time of Plaintiff's wrongful discharge from employment with Penney, Plaintiff was supporting a 15-year-old sister, two minor children and a spouse from whom he was separated pending dissolution of the marriage; Defendant McKay was aware of all these circumstances.

## "XIX

"Positions of the type for which Plaintiff was qualified and with comparable salaries and benefits were virtually non-existent in the economy to one who was after twelve years discharged for unsatisfactory job performance, as Defendant McKay knew."

It may very well be that these allegations, like those in paragraph XI, help to establish the requisite mental state of defendants. They may also help to establish the element of emotional distress. They do not, however, allege any other conduct, *i.e.,* a separate method of infliction of this distress, aside from the aforementioned (and permissible) firing.

"XX

"Plaintiff protested his discharge to District Manager Defendant Chapin, who being fully aware of the circumstances as alleged herein, approved, adopted and authorized Defendant Mckay's conduct; Defendant Chapin as District Manager had the authority and the discretionary power to reverse Defendant McKay's dismissal of Plaintiff.

"XXI

"The actions of Defendant Penney's agents, Defendants McKay and Chapin, were done with malice and in retaliation for Plaintiff's assertion of his valued rights and were intended to inflict upon Plaintiff severe emotional distress."

Again, these allegations establish *intent* and *effect,* not the necessary and impermissible *conduct.* The only *acts* alleged by this complaint to constitute outrageous conduct are (1) telling plaintiff to stop seeing his girlfriend or face the consequences and (2) imposing the consequences. If those acts are not actionable as wrongful termination, what is it that turns them into another tort?

The answer cannot be the degree of the discharged employe's upset—whatever the reasons for that upset may be. Most people who lose their jobs are quite upset. Many face serious consequences from the job loss that worry them, but it has always been the law in this state that, without a violation of some separate public policy not implicated here, the reasons for the discharge of an at will employe are not subject to judicial scrutiny. The majority's decision today turns that rule on its head. I cannot agree.

In summary, I find McKay's alleged behavior rude, boorish, tyrannical, churlish and mean—and those are its best points. I do not, however, find it to be outrageous in the extreme, and I do not believe a jury should be permitted to do so.

I respectfully dissent.