1998 OK CIV APP 123

**Reza MIRZAIE, an individual, Plaintiff/Appellee/ Counter–Appellant,**

**v.**

**SMITH COGENERATION, INC., an Oklahoma corporation; Smith Cogeneration Management, Inc., a British Virgin Islands corporation; Smith Cogeneracion Dominicana, Inc., a Turks and Caicos corporation; and Donald M. Smith, an individual, Defendants/Appellants/Counter–Appellees.**

**No. 88202.**

Court of Civil Appeals of Oklahoma, Division No. 1.

April 21, 1998.

As Corrected Oct. 6, 1998.

---

Kenneth N. McKinney, Debra B. Cannon, McKinney, Stringer & Webster, P.C., Oklahoma City, and Cheryl A. Vaught, Vaught & Conner, P.L.L.C., Oklahoma City, for Plaintiff/Appellee/Counter–Appellant.

R. Brown Wallace, Andrews, Davis, Legg, Bixler, Milsten & Price, Oklahoma City, and Richard L. Brusca, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, D.C., for Defendants/Appellants/Counter–Appellees.

## OPINION

BUETTNER, Judge:

¶1 There are two questions of law presented for review: (1) when an employment contract contains a minimum percentage for a bonus, but no maximum, may a jury determine a bonus higher than the minimum based on what it determines to be the reasonable worth of the employee's services; and (2) did the trial court properly find, as a matter of law, that evidence presented was insufficient to sustain a cause of action for the tort of intentional infliction of emotional distress (outrage). We answer both questions in the affirmative.

### FACTS

¶2 Reza Mirzaie (Mirzaie) was hired by Don Smith (Smith) in 1984 to provide financial and other expertise to assist Smith Cogeneration, Inc. (Smithco) in developing cogeneration projects. Cogeneration produces electricity and a useful by-product, such as steam or heat. Mirzaie was the vice-president of Finance for Smithco and, from 1988 through 1994, was senior vice-president. In 1988, Mirzaie and Smithco entered into a written employment contract, effective September 9, 1987 (the 1987 Contract). The 1987 Contract included the following provision:

> If Mirzaie remains a full-time employee of the corporation or any other entity of which Smith owns a majority interest ("Entity") at the time construction of any other cogeneration facility of the corporation is commenced, Mirzaie **"shall be entitled to receive at least two percent (2%) of the net profits,** as hereafter defined, which the corporation or any such entity actually receives from the operations of any and all such facilities."(Emphasis added.)[1]

¶3 In 1990, Mirzaie and Smith, through his lawyer, were negotiating a new employment contract for Mirzaie, but the negotiations did not result in a new contract. In 1993, Smithco reached an agreement for building a new power plant in the Dominican Republic (Smith Cogeneracion Dominicana, Inc.). In early December 1993, Mirzaie made a written demand for execution of his proposed contract, which Smith did not answer. On December 10, 1993, Mirzaie sued alleging breach of contract and later amended his petition to include intentional infliction of emotional distress.[2] In March 1994, the

---

1. At trial, Smithco defended on the basis that this project had not "commenced" in accordance this provision, and that the Dominican Republic project was not a co-generation facility under the 1987 Contract. The jury found in Mirzaie's favor on both of these issues. There was competent evidence to support these findings.

2. We are necessarily editing much of the procedural and factual complexity found in this law-

employment relationship ended, either by firing or resignation. Hard feelings between the parties were evident.

¶ 4 The jury returned a verdict in favor of Mirzaie on the breach of contract claim regarding the Dominican Republic project and, by way of special interrogatory, found him to be entitled to 9% of Smithco's net cash flow from that operation "either as a result of the 1987 contract or of the 1987 agreement as modified."[3]

*APPEAL*

¶ 5 Smithco contends that when a contract guarantees a minimum bonus, but no maximum, the discretion of how much more than the minimum to pay, if any, lies solely with the employer. The worth of the employee's services in this kind of contract is not a relevant factor. Mirzaie, on the other hand, argues that the jury was authorized, pursuant to 15 O.S.1991 § 112, to determine the amount of the bonus. Section 112 states:

> When a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an interested party, the consideration must be as much money as the object of the contract is reasonably worth.

¶ 6 Smithco's position is that for § 112 to apply, discretion as to the amount must be complete, which, because Smithco had guaranteed a minimum of 2%, is not present here.

¶ 7 Section 112 has not been the subject of substantial interpretation. In *Sac City Canning Co. v. Griffin Grocery Co.*, 99 Okl. 99, 225 P. 702 (1924), the contract set a price of $1.30 per dozen cans of corn. However, the contract included the seller's guarantee against a price decline. The Oklahoma Supreme Court held that for the guarantee to mean anything, the seller was obligated to sell the corn at what it was reasonably worth, using the predecessor of § 112. Thus, the contract set a maximum price but not a minimum. The reasonable worth of the corn was found to be the market price of similar corn, based on evidence submitted by the defendant.

¶ 8 Another case, not specifically citing § 112 or a predecessor, held that where a commodity was sold and no price fixed in the contract, the law fixed the price at the reasonable or market value at time of delivery. *Wilkins v. Jackson*, 100 Okl. 143, 227 P. 882, 884 (1924).

¶ 9 In *Braden Winch Co. v. Surface Equipment Co.*, 196 Okl. 444, 165 P.2d 640 (1945), plaintiff had requested defendant to perform certain machining services. No price was set by the parties because of the contingencies involved. At trial, the parties had widely diverging evidence of the value of the services performed. The Supreme Court cited § 112 as the applicable statute and said:

> The determination of the value of the services performed in this case was a question of fact for the jury, and it was proper for the jury to consider the question in view of the exigencies involved, and not to be guided entirely by what would be customary under ordinary conditions.

*Id.*, 165 P.2d at 643.

¶ 10 The defendant argued that the court should have directed a verdict in plaintiff's favor in the amount defendant tendered into court. Defendant argued that the amount tendered was the customary price charged in that community by others performing similar work.

suit. For example, Mirzaie's claims included: breach of contract for an Oklahoma City project, as well as the Dominican Republic project; claim for injunctive relief; intentional infliction of emotional distress; wrongful termination in breach of an implied duty of good faith and fair dealing; wrongful termination in breach of public policy; fraud; and quantum meruit. Smithco's counterclaims for abuse of process and tortious interference with business relationships were decided by summary judgment in favor of Mirzaie. Mirzaie's claim for intentional inflic-

tion of emotional distress was dismissed by the court at the close of all the evidence. Mirzaie's claims for wrongful termination and breach of duty of good faith and fair dealing were also dismissed.

3. Smithco argued that this instruction was erroneous, but on appeal, the parties have agreed that the jury found that the 1987 Contract, unmodified, was the applicable contract.

¶ 11 The Supreme Court held that for a directed verdict to be proper, the evidence would have to show conclusively that the plaintiff agreed to do the work for 48 cents per unit, or that plaintiff had agreed to take the order at the customary price and that 48 cents was the undisputed customary price. The evidence failed on this count because the defendant testified that it was impossible to get a shop (such as plaintiff's) "pinned down on a rate." Thus, the jury was allowed to consider a broad range of factors in establishing the worth of the services, not just the customary rate.

¶ 12 In the instant case, the contract of the parties obligated the employer to pay a bonus, and set a minimum but no maximum. Based upon the language of the statute, and the cases discussed above, we hold that § 112 is applicable to the facts presented. And, because there was conflicting evidence regarding the value of the services, the issue of the amount of the bonus was for the jury.

¶ 13 This is not a case of an employee being dissatisfied with a voluntary employer paid bonus. If the bonus is not part of the parties' employment contract, then there is no obligation to pay any amount. Whether to pay the bonus and the amount to pay is totally discretionary with the employer. However, when the employment contract obligates the employer to pay a bonus, and the amount thereof is left open as to amount or method of determining the amount, then § 112 applies. If the parties do not agree on the amount, it is not within the discretion of the employer to refuse to pay any bonus, or, as in this case, claim the bonus is limited to the minimum specified in the contract. The employee may sue to have the bonus determined by a jury under § 112. If the parties to the employment contract wish to avoid this result, they may set an amount, agree on a formula to determine the amount, or make it a truly voluntary payment to be determined by the employer. According to § 112, it is only when the amount of consideration is unspecified in the contract, or left to the discretion of an interested party, that the statute applies. The 1987 Contract squarely falls within the parameters of § 112.

¶ 14 Smithco cites *Cain's Coffee Co. v. McNutt,* 308 P.2d 651 (Okla.1957) for the proposition that an employee cannot sue to recover a discretionary bonus. However, in *Cain's Coffee,* the issue was whether an employee fired in October 1955 was entitled to receive a Christmas 1955 bonus. The Supreme Court found that the undisputed evidence was that only employees working in December of the year received Christmas bonuses. As a result, the plaintiff's verdict was reversed.

¶ 15 Two courts outside Oklahoma have reached similar conclusions. In *Nave v. Taugher,* 49 Cal.App. 308, 193 P. 508 (1920), the court applied a substantially similar statute in a proceeding to recover for legal services. The amount had been left to the discretion of the client. The client offered $200 which the attorney refused. The court said

> When a contract does not determine the amount of the consideration, but leaves it to the discretion of an interested party, the consideration must be reasonable. It was therefore incumbent upon the defendant to pay to [the attorney] so much money as his services, which were the object of the contract, were reasonably worth.

193 P. at 510. Likewise, the court held that the amount was a jury question. *Id.*

¶ 16 In *Fruth v. Gaston,* 187 S.W.2d 581 (Tex.Civ.App.1945), the employee was promised additional compensation between 3 and 5% of net profits. The court held that the law would imply a reasonable percentage between these limits. Thus it was error for the trial court to direct a verdict in the employer's favor. These decisions support our interpretation of § 112.

### COUNTER–APPEAL

¶ 17 At the close of all the evidence, the trial court sustained Smithco's demurrer to the evidence as to Mirzaie's claim for damages for intentional infliction of emotional distress and did not submit the claim to the jury. Mirzaie contends that the court erred in excluding some relevant evidence during trial. He preserved the alleged error through an offer of proof. He argues that

Smithco's "extreme and outrageous" conduct meets the requirements for the tort of intentional infliction of emotional distress. Having reviewed the record, we agree with the trial court's determination and affirm.

¶ 18 Adopting the approach of the Restatement of Torts (Second) § 46, the Oklahoma Supreme Court in *Breeden v. League of Services Corp.*, 1978 OK 27, 575 P.2d 1374, 1377 stated that the "court, in the first instance, must determine whether the defendant's conduct *may* reasonably be regarded *so extreme and outrageous* as to permit recovery, or whether it is necessarily so." It is also for the court to determine, in the first instance, "whether based upon the evidence presented, *severe emotional distress* can be found." *Id.* at 1377. "The outrageous and extreme nature of the conduct to be examined should not be considered in a sterile setting, detached from the milieu in which it took place." *Eddy v. Brown*, 1986 OK 3, 715 P.2d 74, 77, citing *Pakos v. Clark*, 253 Or. 113, 453 P.2d 682 (1969). Consequently, as was true in *Anderson v. Oklahoma Temporary Services, Inc.*, 1996 OK CIV APP 90, 925 P.2d 574, 576, the office setting is a factor for the court to consider. Comment d to § 46 of the Restatement of Torts (Second) provides guidance to the boundaries of liability:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

\* \* \*

The liability clearly does not extend to mere insults, indignities, threats annoyanceses, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

¶ 19 In light of these principles, we review the evidence favorably to the nonmoving party, including that offered but not admitted.

Don Smith would testify that during a normal staff meeting which included the professional and office staff, but not Mirzaie who was out of town, after Mirzaie filed his lawsuit against SMITHCO, but before he was fired (Plaintiff) or resigned (Defendants) that Mr. Smith said two things:

(1) "I have talked to a couple of psychiatrists to find out why Reza sued me. I'm deeply hurt that Reza sued me, so I have talked to psychiatrists to find out why he did it. And what I have been told is that it may be because his fiancee Cindy is attracted to me and since she can't have me she is putting Reza up taking these actions against me and trying to get back at me through Reza."

(2) "That Mr. Smith said to his staff, that the problem with Reza and his work—he had been criticizing his work—was that he was obsessed with blonde pussy. And as I told you [the court] when counsel argued about that being a very critical word and a word which could be prejudicial, I offered not to go into that, merely to ask the witness, was there a sexually derogatory comment made about you and your fiancee and did that offend you, and that's all I would propose to ask about that." [4]

— Mirzaie was one of three key management people at SMITHCO.

— Before the lawsuit was filed, Smith would call Mirzaie at 3:00 a.m. and browbeat him for hours, making him run uncalled-for financial case analyses on the computer.

— At a meeting in Houston, Mirzaie, Smith, and Smith's attorney were scheduled for an informal breakfast meeting regarding a hotel project. Mirzaie arrived without coat and tie, intending to dress after breakfast. Smith loudly and publicly told Mirzaie that he was not allowed to sit at the table with them because he was not properly dressed.

— Smith required Mirzaie needlessly to cancel vacation plans.

4. Mirzaie states that the second offer of proof was disputed as a matter of fact. It might also have been uttered in a different staff meeting, but during the same time frame.

— Smith did not allow Mirzaie to take a day off to spend with his wife at the hospital following the birth of his son.

— Smith would yell at Mirzaie in front of other company executives, and force him to work unreasonable hours on consecutive days without reasonable necessity.

— Mirzaie suffered severe headaches related to lack of sleep and job-stress.

— Smith's notice of termination arrived at Mirzaie's home two hours before his scheduled wedding.

— Paul Hammons would have testified that Smith's actions were excessively harsh and abusive.

— Steve Harvey would have testified that Smith intentionally called Mirzaie's current wife Cindy by his former wife's name, "Nahid."

¶ 20  In *Breeden v. League Services Corp., Id.* at 1378, the court held that a collection company's conduct was not so outrageous in character as to give rise to a cause of action when Collection Company (1) mailed three letters to debtor's home; (2) mailed three letters to debtor's place of employment; (3) made several tries to contact the debtor at home and work by telephone (Breeden claimed 16 calls were placed to her at work); (4) Collection company had only one telephone conversation with plaintiff. In that contact, she was called a "God damned liar and deadbeat." The calls were placed during reasonable hours.

¶ 21  In *Eddy v. Brown, Id.* at 76–77, the court entered summary judgment in favor of defendant Brown, Eddy's supervisor at Texaco. Eddy's claim was founded on the following facts: (1) Texaco did not efficiently handle his worker's compensation claim; (2) Texaco was negatively disposed towards him because of his complaint with the National Labor Relations Board; (3) Texaco turned down his claim of payment for accrued vacation time he requested instead of time off work; (4) Texaco refused him vacation time after he returned to work following sick leave; (5) his supervisor and foreman ridiculed Eddy for his diligent efforts as a union steward in collecting a large number of grievances, although the two did concede that he was correct as to 90% of the grievances; (6) he was told that, although he was overqualified for his job, he would never advance; (7) he was requested to rewrite a training manual without compensation; (8) a reassignment to train other employees, coupled with his removal from the graveyard shift, resulted in a reduction in pay; (9) he was required to take a hearing test even though he had taken one two months earlier; (10) the supervisor ridiculed him when he missed the test requirements on a project; (11) the foreman rejected Eddy's idea for some improvements yet tried the very idea three more times without giving Eddy credit for the idea; (12) while on sick leave, the supervisor and foreman harassed Eddy about medical certificates needed because Texaco would not honor a differing diagnosis from a chiropractor; (13) the supervisor and foreman mimicked and ridiculed Eddy behind his back after directing him to read a safety bulletin aloud to co-workers when they knew his speech was impaired by postsurgical medication; (14) the foreman commented that Eddy had done a stupid thing when, in an effort to stop a kitchen blender, he stuck his hand between the blades; (15) Texaco arranged an appointment for Eddy with the company physician who prescribed mood elevators and recommended a psychiatric evaluation; and (16) because of the strain from financial situation and harassment from bill collectors, Eddy had to seek psychiatric counseling.

¶ 22  Finally, in *Anderson v. Oklahoma Temporary Services, Inc., Id.* at 577, the facts insufficient to support a claim for outrage included: (1) at a meeting, a female supervisor described how sexual favors could be used to obtain business; (2) at a lunch with a co-worker and the supervisor, Anderson was embarrassed and angry over a discussion of her faults; (3) the supervisor smoked around Anderson after being asked to stop; (4) the supervisor used a profanity within the hearing of customers; made lewd remarks about Anderson; told Anderson she would have to comply with the dress code; (5) the supervisor left the door open to the restroom, came out with her skirt up to her waist; opened her blouse to show a bra to co-

workers on two occasions; and (6) the supervisor commented on her own sex life with her husband within the hearing of employees and made sexual comments. Also see *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 433 (10th Cir.1990) (supervisor yelled, cursed, and harshly criticized an employee; summary judgment for employer affirmed.)

¶ 23  The trial court acted in conformity with Oklahoma jurisprudence on the question of the tort of intentional infliction of emotional distress. We hold that the trial court did not err in finding nothing in this working milieu that would elevate the recited facts to the "outrageous" level.

¶ 24  For these reasons, we affirm the trial court's dismissal of Mirzaie's claim for damages resulting from his allegation that he was a victim of outrageous conduct.

¶ 25  We have considered the other arguments of the parties but they do not merit discussion based upon our analysis above.

¶ 26  The judgment and order of the trial court are AFFIRMED.

HANSEN, P.J., and JOPLIN, J., concur.